NOT DESIGNATED FOR PUBLICATION

No. 123,097

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CARDELL TURNER,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed October 28, 2022. Convictions affirmed, sentence vacated, and case remanded with directions.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant, and *Cardell Turner*, appellant pro se.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GARDNER, P.J., MALONE and CLINE, JJ.


CLINE, J.: Cardell Turner appeals from his criminal convictions, alleging errors arising out of the admission of recorded telephone calls at trial, the effectiveness of his trial counsel, and the denials of his motion for substitute counsel and motion for the district court judge to recuse himself. Because we find Turner either did not show error or cannot show prejudice from any error, we affirm his convictions. But since the district court misclassified two of Turner's prior out-of-state convictions as person felonies, we vacate his sentence and remand for resentencing.

1

FACTS

A jury convicted Turner of conspiracy to commit murder in the first degree, attempted murder in the first degree, and attempted murder in the second degree based on his attempted shooting of Alberto Alfaro and Enrique Umana Somoza. On August 14, 2018, while Somoza was helping jump his neighbor Alfaro's truck, Turner pulled up beside them in a black BMW. Turner pointed a gun at them and pulled the trigger, but it did not fire. Alfaro testified he started to run, then turned around to face Turner. He said Turner screamed that he would kill him while messing with his gun, apparently trying to fix it. At that point, Alfaro started laughing and told Turner to "get off." Turner then drove away.

Turner largely did not dispute this version of events at trial. Turner testified that he lived in California and worked for a drug cartel as an interstate money courier. He explained that he came to Wichita at the request of the cartel to pick up money from Alfaro and a third party, Rogelio Velasquez. Turner said Alfaro did not have the money when Turner met with him upon arrival in Wichita, claiming he needed a couple of days. After Alfaro did not show up to a follow-up meeting, Turner began looking for him, eventually locating him after waiting outside his home. Turner admitted approaching Alfaro while he and Somoza were jumping his truck, hoping to catch Alfaro in a "low compromised" position so he could confront him about the money. Turner claimed after he pulled up next to the truck, Alfaro spun around holding a gun and pointed it at him. Turner said he had a pistol sitting in his lap, which he claimed was necessary for protection since his job for the cartel required him to carry large amounts of money. Turner said he grabbed his pistol and tried to fire once he saw Alfaro pointing a gun at him. After his gun malfunctioned, Turner admitted Alfaro laughed at him instead of attempting to shoot him, at which point Turner drove off. Alfaro denied having a weapon or pointing a gun at Turner.

Somoza reported the incident to the police, who interviewed Alfaro about a week later. Aside from the information reported by Somoza and Alfaro, the Wichita Police Department also received recorded phone calls collected in an FBI wiretap out of Oklahoma. Velasquez was the subject of this wiretap, which was part of a methamphetamine distribution and money laundering investigation. Based on intercepted phone calls between Velasquez and Turner, FBI agents became concerned that Turner planned to commit an unspecified crime in Wichita and began coordinating with Wichita police before the incident.

Before trial, Turner unsuccessfully moved to suppress the admission of these phone calls. Seven of the calls were played for the jury, along with a recorded call that Turner made to Velasquez from jail. In one of these calls, Turner discussed sitting outside a house, waiting for the owner of a white truck to emerge. In another, Turner said he had located the man standing outside by his truck, but he "can't do nothing" because he was driving and "there is too many people out here waiting." Turner then said, "If I had somebody who could drive then I could get it." He told Velasquez the man's hood was up and he was jumping his truck. Velasquez responded by telling Turner to go up while the man was under his hood and "do yo thing and just jump on the motherfuckin' freeway" before making sure that Turner knew how to "get away around there." Turner expressed concern that there were so many people around the police would get a description of his car. Velasquez, however, told Turner that if the man left, he would probably go to another part of town that was "kind of hot." Velasquez told Turner he was at the "best spot now," telling him that he should "just drive smooth." In the next call, Turner angrily informed Velasquez the gun did not work and the man laughed at him. In another, Turner told Velasquez "that fat boy . . . he might have to go too" because he had seen Turner's face.

Turner twice moved for substitute counsel before trial, although he withdrew his first motion after it was heard. In both motions, Turner claimed communications had

3

broken down between him and his attorney, and he challenged his attorney's diligence in investigating the case and preparing for trial. The district court was forced to suspend the hearing on Turner's second motion after Turner grew agitated and repeatedly interrupted the court. The court ultimately denied Turner's motion, finding there was a reasonable basis to believe the attorney/client relationship had not deteriorated to a point where counsel could no longer effectively represent Turner.

After Turner was convicted, his attorney moved for a new trial and judgment of acquittal. He also moved to withdraw, claiming Turner alleged that he had received ineffective assistance of counsel, which created a conflict of interest necessitating his withdrawal. Turner moved pro se for substitute counsel and for a new trial based on allegations of ineffective assistance of counsel. The district court granted Turner's motion for substitute counsel and his counsel's motion to withdraw, finding there had been a complete breakdown in communication and a conflict of interest had arisen based on Turner's allegations necessitating the appointment of new counsel. The district court then appointed new counsel to represent Turner. The court denied Turner's motions for a new trial and judgment of acquittal. It also denied several motions Turner filed requesting the presiding judge to recuse himself.

The district court sentenced Turner to 653 months' imprisonment for attempted first-degree murder, 123 months' imprisonment for conspiracy to commit first-degree murder, and 61 months' imprisonment for attempted second-degree murder, with the sentences to run consecutive.

ANALYSIS

*Did the district court err in admitting recorded calls between Turner and his alleged coconspirator?*

Turner first argues the district court erred in admitting statements at trial that were part of three of his recorded phone calls with Velasquez. He claims these statements were inadmissible hearsay because the coconspirator exception only applies to statements made during the conspiracy, and these three calls were made after the incident. The State counters by arguing Turner failed to preserve his claim with a timely and specific objection and inadequately briefed the issue.

We agree Turner failed to preserve his objections to these calls. While he objected to the introduction of this evidence at trial, he did so on grounds other than those argued on appeal. Issues not raised before the district court generally may not be raised on appeal. *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022). In line with this rule, a party may not object to the introduction of testimony on one ground at trial and assert another ground on appeal. 315 Kan. at 183. And the contemporaneous objection rule, codified in K.S.A. 2021 Supp. 60-404, requires a timely and specific objection to the admission of evidence at trial to preserve issues arising from that admission on appeal.

First, on appeal, Turner mainly focuses on his own statements in the recordings. But Turner never challenged the admission of his own statements in the recorded phone calls before the district court—he only challenged the statements made by others. So to the extent that he now challenges the admission of his own statements, we find he failed to preserve that issue.

Turner also failed to preserve his objection to the admission of the statements of others on these three calls because he did not raise the issue he now argues before the district court over these three calls. For example, in his motion to suppress the calls,

Turner did not claim the coconspirator exception did not apply—he simply argued the statements of any party other than himself were inadmissible hearsay. While his attorney did tell the district court before voir dire that he planned to object at trial to the admission of a phone call between Velasquez and another individual, Pedro, because any conspiracy had ended by that point, Turner does not object to the admission of that call on appeal.

At trial, Turner objected to the "testimony of [Velasquez] and any other witness" who was unavailable for cross-examination. After the State countered that Velazquez' testimony was admissible under the coconspirator exception to the hearsay rule, the district court asked Turner whether he was claiming that Velasquez was "not a co-conspirator or shouldn't be considered one?" Defense counsel responded, "[I] [a]nticipate the Court to overrule me, but I'll make the objection and ask for a running objection." The district court granted this running objection, and Turner did not object to the admission of the recorded calls on any other grounds, simply referencing his running objection when the calls were admitted and published. This general objection cannot preserve the specific challenge he now raises on appeal.

Our Supreme Court has emphasized the importance of a timely and specific objection to the admission of evidence at trial:

> "'The purpose of the rule requiring a *timely* and *specific* objection is to give "'the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial.' [Citation omitted.]'" (Emphasis added.)
> "In short, the trial court must be provided the specific objection so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error." *State v. Hollingsworth*, 289 Kan. 1250, 1257, 221 P.3d 1122 (2009) (citing *State v. King*, 288 Kan. 333, 342, 204 P.3d 585 [2009], and *State v. Richmond*, 289 Kan. 419, 428-29, 212 P.3d 165 [2009]).

Since Turner failed to provide the district court the opportunity to consider the objection he now raises to the admission of this evidence, he has waived this issue for our consideration.

We similarly find Turner has waived the issue he raises in his pro se supplemental brief. There, he argues the district court erred in allowing the admission of the recorded calls intercepted as part of the FBI investigation because the authorizing warrants did not name him specifically and the interception of the calls violated federal wiretap laws. Turner does not, however, explain how the interception of these calls violated federal wiretap laws or cite any authority for the contention that he needed to be named specifically in the warrants authorizing the recording of Velasquez' phone. The failure to support an argument with pertinent authority or explain why a position is sound despite the lack of authority is akin to failing to brief the issue. Such a failure results in a party waiving or abandoning the argument. *State v. Bailey*, 313 Kan. 895, 897, 491 P.3d 1256 (2021). As a result, we cannot consider this claim either.

*Did the district court err in denying Turner's motion for substitute counsel?*

Turner next argues the district court erred in denying his pretrial motion for substitute counsel. We review this decision under an abuse of discretion standard, with Turner bearing the burden of proof. *State v. McGee*, 280 Kan. 890, 894, 126 P.3d 1110 (2006); *State v. Hulett*, 293 Kan. 312, 319, 263 P.3d 153 (2011).

While defendants have a constitutional right to effective assistance of counsel, a defendant does not have a right to choose which attorney will be appointed to represent him or her. *State v. Brown*, 300 Kan. 565, 574-75, 331 P.3d 797 (2014).

> "'[T]o warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest,

7

an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. But ultimately, "[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel."' [Citations omitted.]" *State v. Breitenbach*, 313 Kan. 73, 90, 483 P.3d 448, *cert. denied* 142 S. Ct. 255 (2021).

The focus of the justifiable dissatisfaction inquiry is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney. *State v. Staten*, 304 Kan. 957, 972, 377 P.3d 427 (2016). While counsel has a duty to make reasonable investigations, that duty can be met by making a reasonable decision that particular investigations are unnecessary. *Breitenbach*, 313 Kan. at 91.

On appeal, Turner argues the complaints he voiced to the district court showed a relationship that had broken beyond repair and a lack of trust and communication between Turner and his trial counsel. In particular, Turner notes that he told the district court his trial counsel failed to file promised motions to dismiss and never had his investigator look into Turner's alibi defense. He argues these failures eroded his ability to trust in his counsel's ability to properly prepare the case for trial and led to a breakdown in their relationship. He also argues that while he and his trial counsel's testimony may have differed on who caused the breakdown, both testified that communication had broken down to a point where they could no longer discuss the case. Because the denial of the right to counsel is a structural error, Turner argues this error necessitates reversal for appointment of new counsel and a new trial.

The State argues the district court did not err because Turner's questioning of strategic decisions did not warrant the appointment of new counsel and, if communication was an issue, it was because Turner refused to communicate.

8

As the State correctly notes, a lack of communication between a defendant and defense counsel based on the defendant's refusal to cooperate is not itself a basis for reversal on grounds of ineffective assistance of counsel. *State v. Ferguson*, 254 Kan. 62, 73-74, 864 P.2d 693 (1993). The *Ferguson* court held that under the circumstances of that case, the appointment of substitute counsel would have been futile. 254 Kan. at 75. The court has since reaffirmed this principle, holding that where a defendant is otherwise receiving competent representation and counsel is prepared for trial, and it is doubtful the appointment of substitute counsel would solve the communication problems, a lack of communication between a defendant and defense counsel based on a defendant's refusal to cooperate does not establish justifiable dissatisfaction. *State v. Sappington*, 285 Kan. 158, 169-70, 169 P.3d 1096 (2007).

At the hearing on Turner's motion for substitute counsel, counsel testified that, despite the breakdown in communication, he was prepared to take the case to trial. Counsel said he did not feel there was any issue between him and Turner until Turner filed the motion for substitute counsel and began refusing to talk to him. Counsel stated, however, that he and Turner were unable to communicate then because Turner would not discuss the case. Turner, for his part, testified there was little to no communication between him and his trial counsel. Turner denied refusing to talk with his trial counsel, stating they were able to communicate at first, but his trial counsel eventually stopped coming to talk to him.

Before ruling on Turner's motion, the district court advised Turner of the nature of the attorney-client relationship and stated it was fairly certain, based on the allegations in his motion, that if it granted him substitute counsel, he would still have the same complaints. The district court judge also noted, "I don't really see any problem with [trial counsel] or his performance, I think the real problem here is . . . your choice not to participate."

9

The district court appears to have based its denial of Turner's motion on an implicit credibility finding. It found Turner was receiving adequate representation and any concerns he had were unrelated to deficiencies in his counsel's performance but based instead on his unreasonable expectations of the attorney-client relationship. It therefore determined any substitute counsel was likely to encounter the same problems. This determination was in line with the principles laid out in *Ferguson* and *Sappington*, supported by trial counsel's testimony, and was not unreasonable. For these reasons, we find the district court did not abuse its discretion in denying Turner's motion for substitute counsel.

*Did the district court err in failing to give a self-defense instruction to the jury?*

Turner next argues the district court committed clear error in failing to sua sponte provide the jury with a self-defense instruction. We review this claim in multiple steps. First, we must decide whether the issue was properly preserved below. Second, we consider whether the instruction was legally and factually appropriate. Third, upon a finding of error, we must determine whether that error is reversible. *State v. Douglas*, 313 Kan. 704, 709, 490 P.3d 34 (2021); see also, e.g., *State v. Qualls*, 309 Kan. 553, 555, 439 P.3d 301 (2019) (listing four steps, in which the second step is split into considering two types of errors).

In considering whether the issue was properly preserved and whether the instruction was legally appropriate, appellate courts exercise an unlimited standard of review. In considering whether the instruction was factually appropriate, appellate courts exercise unlimited review of the entire record to determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. *Qualls*, 309 Kan. at 555. And at the final step, whether the issue was properly preserved affects the standard of review. An unpreserved issue will be reviewed for clear error. K.S.A. 2021 Supp. 22-3414(3). To establish clear

error, the party alleging the error must convince the court the jury would have reached a different verdict without the error. *Douglas*, 313 Kan. at 710.

*Preservation and the invited error doctrine*

The State first argues the doctrine of invited error precludes review of Turner's claim on this issue. While the failure to preserve an instructional error claim only affects the standard applied at the final step, Kansas courts will not review an instructional error claim when the invited error doctrine applies. The doctrine's application is a question of law over which an appellate court has unlimited review. *Douglas*, 313 Kan. at 706.

The doctrine of invited error precludes a party from asking a district court to rule a given way and then challenging that ruling on appeal. *Douglas*, 313 Kan. at 707. In the context of an instructional error, however, the mere failure to request an instruction does not trigger invited error. It is only when a defendant actively pursues what that defendant later argues to be an error that the doctrine applies. 313 Kan. at 707. Thus, there are two circumstances in which invited error may apply: (1) a defendant's affirmative request to omit an instruction and (2) a defendant's affirmative rejection of the court's offer to give an instruction. The ultimate question is whether the record reflects the defense's action in fact induced the court to make the claimed error. 313 Kan. at 708 (citing *State v. Walker*, 304 Kan. 441, 444-45, 372 P.3d 1147 [2016]).

Turner did not request a self-defense jury instruction. At the jury instruction conference, the State raised the issue, arguing a self-defense instruction was not warranted since Turner was the initial aggressor. When asked if he agreed the instruction was not warranted, Turner's counsel simply replied, "Judge, I'm not requesting any other instructions." In response, the district court judge stated, "Well, if it is not being requested and I will also rule that, as the State articulated it, it is not merited."

11

The State argues Turner induced the district court, at least in part, not to give the instruction and the invited error doctrine thus precludes review of this issue. Turner argues that he merely failed to request the instruction and did not actively argue one should not be given. In support, Turner points to statements made by the defense counsel in *Walker* and *Douglas*, two cases in which the doctrine was held not to apply.

In *Walker*, the district court found that a lesser included offense instruction was not warranted and noted the defense was not requesting one; defense counsel confirmed no instruction was being requested. In *Douglas*, the district court asked defense counsel if any lesser included offense instructions were being requested. Counsel responded, "'I know that I am not requesting any lesser included offenses and indeed there may not be any applicable ones either.'" 313 Kan. at 707. The district court then stated that it agreed with defense counsel and found the instructions were not warranted. In both cases, the Supreme Court held the invited error doctrine did not preclude review of the failure to give the instruction because defense counsel had merely acquiesced, rather than affirmatively inviting the ruling. *Douglas*, 313 Kan. at 709; *Walker*, 304 Kan. at 445.

As in both *Walker* and *Douglas*, Turner's counsel did not induce the district court not to give the instruction; he merely accepted the decision. Under the standard laid out in those cases, the invited error doctrine does not apply. But while the invited error doctrine does not preclude consideration of Turner's claim, his lack of objection to the district court's failure to give a self-defense instruction means that he must show clear error at the third step of the analysis.

*A self-defense instruction was legally and factually appropriate.*

The next question, then, is determining whether a self-defense instruction was legally and factually appropriate.

Here, an instruction on self-defense would have been legally appropriate under K.S.A. 2021 Supp. 21-5222. See, e.g., *State v. Dixon*, 248 Kan. 776, 782, 811 P.2d 1153 (1991) (self-defense jury instruction can be legally appropriate for charge of attempted first-degree murder). We now turn to whether the instruction was factually appropriate.

The elements to establish the right to use deadly force in self-defense are codified at K.S.A. 2021 Supp. 21-5222:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

Under this statute, deadly force can be justified only if a person reasonably believes deadly force is necessary to prevent imminent death or great bodily harm. *Qualls*, 309 Kan. at 557. To determine whether deadly force is justifiable, courts use a two-part test:

"'The first is subjective and requires a showing that [the defendant] sincerely and honestly believed it was necessary to kill to defend herself or others. The second prong is an objective standard and requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary. [Citations omitted.]'" 309 Kan. at 557.

Self-defense is unavailable to a person who:

13

"(a) Is attempting to commit, committing or escaping from the commission of a forcible felony;

"(b) initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or

"(c) otherwise initially provokes the use of any force against such person or another, unless:

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force." K.S.A. 2021 Supp. 21-5226.

Kansas law entitles a defendant to an instruction on every affirmative defense that is supported by competent evidence:

"A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies. Once the defendant satisfies the burden of producing such evidence, the state has the burden of disproving the defense beyond a reasonable doubt." K.S.A. 2021 Supp. 21-5108(c).

Self-defense is such an affirmative defense. *Qualls*, 309 Kan. at 558.

The Kansas Supreme Court has cautioned against weighing competing evidence in determining whether competent evidence supports giving an instruction. See, e.g., *Qualls*, 309 Kan. at 557-58; *State v. Haygood*, 308 Kan. 1387, 1405-07, 430 P.3d 11 (2018). Even if the only evidence supporting a defendant's theory consists of the defendant's own testimony, which may be contradicted by all other witnesses and physical evidence, the defendant may still have met her or his burden of providing competent evidence sufficient to require giving the instruction. *Qualls*, 309 Kan. at 557-58. If the defendant's

14

testimony recited circumstances that could allow a reasonable juror to conclude she or he had a right to defend with deadly force, then the defendant was factually entitled to a self-defense instruction. 309 Kan. at 558.

Again, in determining whether a self-defense instruction was factually appropriate, this court must determine whether there was sufficient evidence, viewed in the light most favorable to Turner, to have supported the instruction.

Turner argues his testimony provided competent evidence sufficient to support giving an instruction on self-defense. He argues that although he had his gun in his lap when he drove up alongside Alfaro, he grabbed and tried to use it only after Alfaro pulled a gun on him first. Turner argues this testimony satisfies the subjective and objective components of self-defense and whether the defense applied should thus have been left to the jury.

The State argues a self-defense instruction was not factually appropriate here because Turner was the initial aggressor. In the State's view, Turner provoked Alfaro's use of force by driving up with his gun displayed in his lap. The State argues the fact that Turner did not grab his gun until after Alfaro pointed his gun at Turner is inconsequential, as Turner's gun was still in an easily accessible position that would have been readily apparent to Alfaro. Turner argues that many people in Kansas carry firearms on their person and simply approaching a person while armed does not automatically make that person an initial aggressor.

Viewing the evidence in the light most favorable to Turner, we find a self-defense instruction was factually appropriate here. Turner's testimony was competent evidence supporting the defense, as a rational fact-finder could reasonably find, based on this testimony, the subjective and objective requirements of self-defense were met. First, Turner's testimony supports that Turner sincerely thought deadly force was necessary to

defend himself. Turner testified that Alfaro turned around pointing a gun at him and he thought Alfaro would shoot him. It was only then, Turner testified, that he grabbed his own gun and tried to fire. Second, a reasonable person in Turner's position would have come to the same conclusion. A reasonable person, confronted with someone turning and pointing a gun at them would perceive the use of deadly force in self-defense as necessary.

Despite the State's contention, Turner's version of events does not suggest he was the initial aggressor. Although Turner had the gun in his lap, a rational fact-finder could reasonably conclude the gun was not visible to Alfaro. Additionally, a review of caselaw reveals that an individual's visible display of a gun on their person is not enough to make them an initial aggressor where they do not brandish or reach for the weapon.

First, taking the evidence in the light most favorable to Turner, a rational fact-finder could reasonably conclude that Turner's gun would not have been visible to Alfaro. Turner testified the gun was sitting in his lap and after he pulled up alongside the two men, Alfaro had his back to him leaning over the truck and turned his head around to look at him briefly before spinning around holding a pistol. Although Turner did not testify about the position of the two men relative to his car, both Somoza and Alfaro testified that when Turner pulled up beside them, he pulled up with the driver's side closest to them. And Somoza stated the driver's side window was rolled halfway up and tinted dark enough that you could not see anything through it, but the window was open enough to see Turner's face. For these reasons, viewing the testimony in the light most favorable to Turner, a rational fact-finder could reasonably conclude that Turner's gun would not have been visible to Alfaro when he looked over his shoulder at Turner.

Neither party has cited any authority to support their position on the issue of whether the visible display of a gun in a defendant's lap or waist without trying to reach for the weapon can qualify the defendant as an initial aggressor. While a search of Kansas

16

cases does not reveal any opinions directly on point, when faced with similar facts, this court has focused on whether a weapon was brandished or held in a person's hands in determining whether self-defense applied. See, e.g., *State v. Harris*, No. 120,732, 2020 WL 2602050, at *7-8 (Kan. App. 2020) (unpublished opinion) (defendant was an initial aggressor where he brandished firearm at victim before victim followed him out of house to defendant's car, at which point defendant shot victim); *State v. Miller*, No. 119,763, 2019 WL 3850689, at *4-5 (Kan. App. 2019) (unpublished opinion) (self-defense instruction inappropriate where defendant shot victim standing in his own yard holding pistol at his side; victim was arguing with bystanders while holding a gun before being confronted by defendant but never pointed the weapon at anyone); *State v. Collins*, No. 117,409, 2018 WL 5305661, at *8 (Kan. App. 2018) (unpublished opinion) (no evidence to suggest defendant was under threat of imminent death or great bodily harm when he shot victim where victim had knife in a sheath on his belt but there was no evidence he had a weapon in his hands).

The panel in *Miller* focused on K.S.A. 2021 Supp. 21-5221(a)(2) in concluding the defendant was not entitled to a jury instruction on self-defense. In that case, the defendant sought to justify shooting the victim because the victim was standing outside his house holding a pistol by his side and arguing with several bystanders. The defendant argued that this conduct by itself constituted a threat of deadly force. This court disagreed, noting the self-defense statutes provide that an individual's possession and display of a pistol by itself does not justify the use of deadly force by another, so long as the individual's purpose in displaying the gun is limited to creating the apprehension he or she would use force if necessary. See K.S.A. 2021 Supp. 21-5221(a)(2).

Turner testified he had the pistol in his lap, and it was there to protect himself in case someone tried to rob him. So a jury could reasonably conclude Turner's purpose for having the gun in his lap, without reaching for it, was limited to creating the apprehension he would use force if necessary. Although the question here is whether

17

Turner's display of a gun made him the initial aggressor, rather than whether Turner's display of a gun in his lap was a threat of deadly force, K.S.A. 2021 Supp. 21-5221(a)(2) is still instructive. If an individual may display a gun purely to create the apprehension he or she would use deadly force if necessary, it follows that the same individual is justified in using deadly force if it does become necessary.

Finally, even if we agree with the State that Turner was an initial aggressor, that fact would not end the analysis. K.S.A. 2021 Supp. 21-5226(c)(1) provides that self-defense is unavailable to a person who

"(c) . . . initially provokes the use of any force against such person or another, unless:

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force."

Thus, even if Turner were the initial aggressor, he was still entitled to a self-defense instruction if he had reasonable grounds to believe he was in imminent danger of death or great bodily harm and had exhausted every reasonable means to escape other than the use of deadly force. Here, competent evidence (viewed in the light most favorable to Turner) supported application of the safe harbor provision. Turner testified that Alfaro turned around and pointed a gun at him at close range. Although Turner arguably could have tried to drive away rather than return fire, given the proximity of Alfaro to the car, a rational fact-finder could reasonably find this was not a reasonable means to escape danger, so drawing his own gun was Turner's only reasonable chance at survival.

Viewing the evidence in the light most favorable to Turner, a rational fact-finder could reasonably conclude the defense of self-defense applied here. Turner was thus

entitled to the instruction, and the district court erred in not giving it. The next question, then, is whether this error is reversible.

*Turner has failed to show clear error.*

To establish clear error, Turner must convince us the jury would have reached a different verdict if a self-defense instruction had been given. *Douglas*, 313 Kan. at 710. Here, however, the evidence against him was overwhelming. Based on the testimony of Somoza and Alfaro, as well the recorded calls, we find it unlikely the jury would have reached a different conclusion if the instruction was given. Thus, we find Turner has failed to demonstrate the court's failure to give the instruction was clear error.

*Turner's claims in his pro se supplemental brief*

In his pro se supplemental brief, Turner argues the district court erred in that it gave the jury identical instructions for attempted first-degree murder and attempted second-degree murder and failed to give an instruction for attempted second-degree murder. But the instructions given to the jury for attempted first-degree murder and attempted second-degree murder were not identical, and the jury was indeed presented with an instruction for attempted second-degree murder. As a result, this claim also fails.

*Did the district court err in denying Turner's motion for a new trial based on ineffective assistance of counsel?*

Turner next argues the district court erred in denying his motion for a new trial based on ineffective assistance of trial counsel. A district court may grant a new trial to a defendant "if required in the interest of justice." K.S.A. 2021 Supp. 22-3501(1). An appellate court reviews the district court's decision on a motion for a new trial for an abuse of discretion. *State v. Butler*, 307 Kan. 831, 852, 416 P.3d 116 (2018).

19

When, as here, the district court conducted an evidentiary hearing on a defendant's motion for a new trial, appellate courts review the district court's underlying factual findings using a substantial competent evidence standard and review the legal conclusions based on those facts de novo. *State v. Johnson*, 304 Kan. 924, 950, 376 P.3d 70 (2016). Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion. *Butler*, 307 Kan. at 853.

To establish ineffective assistance of counsel, a defendant must satisfy a two-prong test. The first prong requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Under the second prong, the defendant must establish prejudice by showing there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Butler*, 307 Kan. at 852-53.

A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time. And appellate courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. 307 Kan. at 852-53.

It is the lawyer's responsibility to decide what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions. 307 Kan. at 853-54. Strategic decisions made after thorough investigation of law and facts are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely as long as reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or

20

to make a reasonable decision that makes particular investigations unnecessary. Yet it is inappropriate to argue that counsel's alleged strategic decisions are insulated from review when counsel lacks the information necessary to make an informed decision due to an insufficient investigation. 307 Kan. at 854.

On appeal, Turner reprises only some of the allegations of ineffective assistance of trial counsel he included in his motion for a new trial. He now alleges his trial counsel failed to adequately communicate with him in preparing for trial and the result of this lack of communication was a failure to reasonably investigate the case or prepare a defense. Turner alleges his trial counsel was ineffective in: (1) only meeting with him "a couple" of times and failing to properly communicate with him; (2) failing to conduct a proper investigation of his case; (3) failing to develop a trial strategy and prepare Turner to testify; (4) failing to call other witnesses; (5) failing to discuss possible defenses or jury instructions; and (6) failing to request a jury instruction on self-defense.

Turner argues his trial counsel only engaged in limited communication with him and that, as a result, his trial counsel did not conduct a reasonable or effective investigation of his case. Turner notes that without a sufficient investigation and information to make an informed decision, a trial counsel's decisions cannot be justified as trial strategy. Turner also argues the lack of communication or a proper investigation on his counsel's part led to the failure to develop a trial strategy. In Turner's view, his counsel should have requested a self-defense instruction and argued a theory of self-defense at trial, given Turner's testimony and the lack of any other sound strategy. Instead, Turner claims, his counsel "told him he really had no defense." Turner similarly argues that his counsel's failure to investigate a possible competency or lesser included offenses defense, as well as his failure to obtain Turner's phone records and challenge the authenticity of the recorded calls, was unreasonable and hamstrung his chances at acquittal.

The State argues that counsel's testimony directly refuted Turner's allegations and the district court made an implicit credibility finding that counsel was more believable. The State also argues that Turner's "more general complaints regarding strategy, such as failing to request other, unspecified lesser included instructions, cannot form the basis for a successful ineffective assistance of counsel claim," as such decisions are the responsibility of counsel, not the client.

At the hearing on Turner's motion for a new trial, the district court heard testimony from both Turner and his trial counsel. Turner testified his counsel failed to discuss his pro se motions or the charges against him. Turner said he told his counsel that he suffered from mental illness and was on Social Security disability benefits as a result in California. He also testified that counsel never discussed self-defense and he was not sure whether he discussed with his counsel whether he could raise a defense of self-defense immunity. Turner did not feel he had adequate communication with his counsel and his counsel had met with him only "probably twice out of the whole time he was my attorney." He testified that while he and his counsel discussed the content of his testimony before trial, they did not prepare for his testimony. He also testified that he asked his counsel to subpoena his phone records to see if his cell phone had called the numbers implicated in the wiretap. He testified that he asked his counsel to call his girlfriend as a witness and counsel told his investigator to contact her but he never heard anything further about it from his counsel after that. He also testified that his counsel never discussed jury instructions with him before trial. And he testified that his counsel told him he did not have a trial strategy.

Turner's trial counsel testified that he met with Turner multiple times, and more than twice. Counsel was familiar with the standard for competency and was never concerned with Turner's competency. He also testified that any witnesses Turner identified were provided to his investigator. He stated there was never a chance that Turner's girlfriend was coming back to Kansas to testify. Counsel also testified that he

discussed potential defenses with Turner and developed a trial strategy and he never told Turner that he did not have a strategy. He said after reviewing the evidence and discussing possible strategies with Turner, they eventually agreed on the defense strategy.

Counsel testified Turner first told him he was innocent and did not do what the State alleged. But after discussing the evidence, Turner admitted to being on the calls and at the scene but stated he was only there to pick up money from Alfaro and not to kill him. At that point, the defense shifted from refuting the State's version of events to presenting a version of events that lined up with the State's evidence but gave an alternate explanation. Counsel admitted he did not discuss with Turner whether to file for self-defense immunity but he did not believe that it would have been applicable. He testified he requested the district court give all the lesser included instructions that he thought were legally permissible. He considered requesting a self-defense instruction but chose not to because he did not think it was warranted or that the district court would grant it.

The district court found Turner's trial counsel's performance was not deficient and even if it were, Turner had failed to establish prejudice. The court also noted that, based on its observations of Turner during the trial and his pro se filings, it had no concerns about his competency. We find no error in these findings.

As the State notes, although the district court's ruling was brief, it appears to have made an implicit finding that Turner's counsel's testimony was more credible than his own. Turner's counsel directly refuted most of Turner's allegations. We find his testimony was substantial and competent evidence that counsel made strategic decisions after a reasonable investigation. Accordingly, these allegations cannot sustain a successful ineffective assistance of counsel claim.

Turner's counsel stated that he did not question Turner's competency and the district court expressed the same opinion in ruling on the motion. In Kansas, a defendant

23

is incompetent to stand trial when he or she is charged with a crime and, because of mental illness, is: (1) unable to understand the nature and purpose of the proceedings or (2) cannot make or help make his or her defense. K.S.A. 2021 Supp. 22-3301(1)(a), (b); see *State v. Stewart*, 306 Kan. 237, 251, 393 P.3d 1031 (2017). A defendant is presumed competent to stand trial. *State v. Woods*, 301 Kan. 852, 860, 348 P.3d 583 (2015).

A review of the record shows Turner understood the nature and purpose of the proceedings and was actively involved in his case and understood what was happening. Turner does not provide any specific evidence of his alleged incompetency beyond a conclusory statement that he was on Social Security disability in California based on an unspecified mental illness. This allegation is thus similarly meritless.

But just because a self-defense instruction would have been legally and factually appropriate here, given Turner's testimony, does not mean the failure of his attorney to request one prejudiced Turner. Assuming we found Turner's attorney ineffective for his failure to request this instruction, Turner still has the burden to establish he was prejudiced by this failure. And we do not find that he was. To establish prejudice, Turner must show a reasonable probability the jury would have returned a different verdict if a self-defense instruction had been provided. Given the overwhelming evidence against Turner, we find no reasonable probability this instruction would have changed the outcome of his trial.

On appeal, Turner merely argues that "[a] full defense that raised . . . self-defense . . . would have provided a far better chance for [Turner] to obtain a different verdict at trial." While giving the instruction might have improved Turner's chances, given the evidence against him, we do not find this potential to be appreciable. Both Alfaro's and Somoza's testimony contradicted Turner's version of events. And Turner never denied his recorded statements on the calls, which evidence that Turner laid in wait outside Alfaro's house and confronted the men with the purpose of shooting them.

24

In the calls played for the jury, Turner discussed his concern that there were several people out in the area who might see him if he confronted Alfaro, and he also discussed how he could not do anything while he was driving. When Turner told Velasquez about his concerns that he would be seen, Velasquez told Turner to "do yo thing and just jump on the motherfuckin' freeway." They then discussed how Turner could get away afterwards in case he was seen. And when Turner called afterwards, he never mentioned Alfaro having a gun—he only complained to Velasquez about how his own gun did not fire and the men had laughed at him. As the State noted in its closing arguments—if Turner was only there to collect money from Alfaro, why confront Alfaro when he was under the hood of his car, in a "low compromised" position? Why was Turner so concerned he would be seen? And why would Turner need an escape route?

While Turner's counsel's failure to request a jury instruction on self-defense was objectively unreasonable, Turner has not shown this failure prejudiced him given the overwhelming evidence against him. We thus find the district court did not err in denying Turner's motion for a new trial based on ineffective assistance of counsel.

*Turner's claim in his pro se supplemental brief*

In his pro se supplemental brief, Turner claims that counsel was also ineffective for failing to object to the introduction at trial of a handgun found in his hotel room by police. Yet even if counsel was ineffective for failing to object to the introduction of this evidence, Turner also cannot show this error prejudiced him at trial. In his own version of events, Turner admitted to having a gun during his interaction with Alfaro and Somoza. So the fact that the jury learned there was a gun recovered in his hotel room could not have affected the verdict here.

*Did the district court err in denying Turner's motion for recusal?*

Turner next claims the district court judge erred in denying Turner's motion to recuse him. Turner filed two posttrial motions to recuse that judge, which were both denied.

We exercise de novo review over whether a district court judge's recusal is required. *State v. Moyer*, 306 Kan. 342, 369-70, 410 P.3d 71 (2017); see *State v. Sawyer*, 297 Kan. 902, 909, 305 P.3d 608 (2013) (due process claims subject to de novo standard of appellate review); *Kansas Judicial Review v. Stout*, 287 Kan. 450, 459, 196 P.3d 1162 (2008) (interpretation of Supreme Court rules is a question of law); *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 385, 22 P.3d 124 (2001) (when faced with an affidavit of prejudice filed under K.S.A. 20-311d, appellate courts exercise unlimited review, and on appeal must decide the legal sufficiency of the affidavit and not the truth of the facts alleged).

A litigant seeking recusal of a trial judge has at least three possible avenues to do so: (1) the Kansas Code of Judicial Conduct, Supreme Court Rule 601B, Canon 2, Rule 2.2 (2022 Kan. S. Ct. R. at 495); (2) K.S.A. 20-311d(c); and (3) the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Moyer*, 306 Kan. at 370.

When all three types of arguments have been raised, the proper analysis for disqualification claims begins with the statutory framework and the Code of Judicial Conduct, as analysis under these provisions may eliminate the need for constitutional analysis if resolved in the litigant's favor. *Moyer*, 306 Kan. at 370-71.

K.S.A. 20-311d(c) lays out the statutory grounds for seeking recusal of a judge. Subsection (5) provides a litigant may seek recusal where the litigant "has cause to believe and does believe that on account of the personal bias, prejudice or interest of the

judge [the litigant] cannot obtain a fair and impartial trial or fair and impartial enforcement of post-judgment remedies." K.S.A. 20-311d(c)(5). Adverse legal rulings alone cannot sustain a recusal. K.S.A. 20-311d(d); *State v. Sawyer*, 297 Kan. 902, 908, 305 P.3d 608 (2013).

As for the Kansas Code of Judicial Conduct, Supreme Court Rule 601B, Canon 2, Rule 2.2 (2022 Kan. S. Ct. R. at 495), provides that "[a] judge shall uphold and apply the *law*, and shall perform all duties of judicial office fairly and *impartially*." Canon 2, Rule 2.11(A) (2022 Kan. S. Ct. R. at 501), in turn, provides the grounds for disqualification, providing that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's *impartiality* might reasonably be questioned."

Finally, the two-part due process test for whether a criminal defendant can obtain a reversal of a conviction or a vacation of a sentence because of a judge's failure to recuse asks, first, whether the judge had a duty to recuse from the case because the judge was biased, prejudiced, or partial. If so, then the test has examined whether the judge's failure to recuse led to actual bias or prejudice. *Sawyer*, 297 Kan. at 909. The Due Process Clause requires recusal in certain instances in which "'experience teaches that the probability of actual bias . . . is too high to be constitutionally tolerable.'" 297 Kan. at 909.

Turner does not tie his arguments to any specific subsection of the rules outlined above and instead generally argues "the rulings and tenor of the trial showed that Judge [Bruce C.] Brown was biased and should have recused himself." In support, he points to various rulings made by Judge Brown and the judge's removal of Turner from the initial hearing on his motion for substitute counsel and his admonishment of Turner upon resumption of the hearing. Additionally, Turner notes that Judge Brown went beyond the sentence requested by the State in running his sentences consecutive.

As the State correctly points out, K.S.A. 20-311d(d) precludes Turner's reliance on the judge's previous rulings or decisions to argue that he was biased against Turner. See *Sawyer*, 297 Kan. at 908. That the judge ruled against him on various issues after considering the competing legal arguments does not show bias. Similarly, Turner's complaints about Judge Brown's conduct in ending one of his hearings abruptly and admonishing him against future outbursts do not show any bias. A district court must control the proceedings in all hearings and trials and has broad discretion and leeway in doing so. *State v. Kemble*, 291 Kan. 109, 114, 238 P.3d 251 (2010). Judge Brown's conduct in responding to Turner's frequent interruptions appears to have been merely an effort to ensure that he conformed with the rules of court decorum, rather than evidence of bias.

Finally, the district court's imposition of a sentence within the approved range of the sentencing guidelines does not exhibit bias. It is generally within a sentencing judge's discretion to determine whether a sentence should run concurrent with or consecutive to another sentence. "'In fact, this principle of a judge's discretion is so entrenched that the legislature determined a defendant cannot raise the issue of whether imposing consecutive sentences is an abuse of discretion if the sentence is imposed under the Kansas Sentencing Guidelines Act.'" *State v. Brune*, 307 Kan. 370, 371, 409 P.3d 862 (2018) (quoting *State v. Mosher*, 299 Kan. 1, 2-3, 319 P.3d 1253 [2014]).

We thus find that the district court did not err in denying Turner's motion and refusing to recuse himself.

*Does the cumulative effect of these errors warrant a new trial?*

Turner argues that even if these individual errors are not enough on their own to justify a new trial, their cumulative effect does. The test to determine whether cumulative errors require reversal of a defendant's conviction is whether the totality of circumstances

substantially prejudiced the defendant and denied him or her a fair trial. *Boldridge v. State*, 289 Kan. 618, 640, 215 P.3d 585 (2009).

Because both the claims on which Turner has shown error involve the same issue—the failure to give a self-defense instruction—there is nothing to accumulate. See *State v. Hilt*, 299 Kan. 176, 200, 322 P.3d 367 (2014). Furthermore, where the evidence is overwhelming against a defendant, our Supreme Court has instructed that the cumulative error doctrine should not apply. 299 Kan. at 200. Thus, we find the cumulative error doctrine does not apply here.

*Did the district court err in classifying two of Turner's prior California convictions as person felonies?*

Finally, Turner claims the district court erred in classifying two of his prior California convictions as person felonies. Turner argues his California assault with a firearm on a person and his California robbery convictions were improperly classified and, as a result, his criminal history was incorrectly calculated as A instead of E. The State concedes Turner's California robbery conviction was improperly classified but argues his California assault with a firearm on a person conviction was properly classified as a person offense.

Turner concedes that he failed to challenge the classification of these two convictions at sentencing. Yet as he correctly points out, when a district court improperly classifies a prior conviction to determine a defendant's criminal history score, an illegal sentence results. *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 (2015). Because an illegal sentence may be corrected at any time while the defendant is serving it, we may consider Turner's claim for the first time on appeal. See K.S.A. 2021 Supp. 22-3504(a).

Whether a sentence is illegal under K.S.A. 2020 Supp. 22-3504 turns on interpretation of the revised Kansas Sentencing Guidelines Act (KSGA), K.S.A. 2021 Supp. 21-6801 et seq. See *State v. Dickey*, 305 Kan. 217, 220, 380 P.3d 230 (2016). The classification of prior offenses for criminal history purposes likewise involves interpretation of the KSGA. Statutory interpretation is a question of law subject to unlimited review. *State v. Wetrich*, 307 Kan. 552, 555, 412 P.3d 984 (2018).

All prior offenses to the current sentencing are considered when calculating a criminal history score. 307 Kan. at 555. "If a crime is a felony in the convicting jurisdiction, it will be counted as a felony in Kansas." K.S.A. 2021 Supp. 21-6811(e)(2)(A). The parties agree Turner's convictions for assault with a firearm on a person and robbery were felony offenses, making the crimes felonies in Kansas for calculating his criminal history score.

A crime is also designated as person or nonperson. K.S.A. 2021 Supp. 21-6811(e)(3). When considering an out-of-state conviction for classifying a defendant's criminal history score, the district court must refer to the Kansas Criminal Code in effect on the date the current crime of conviction was committed to find a comparable offense. An out-of-state conviction is considered a nonperson crime if there is no comparable Kansas offense in effect on the date the defendant committed the current crime of conviction. K.S.A. 2021 Supp. 21-6811(e)(3). To be comparable, "the elements of the out-of-state crime cannot be broader than the elements of the Kansas crime. In other words, the elements of the out-of-state crime must be identical to, or narrower than, the elements of the Kansas crime to which it is being referenced." *Wetrich*, 307 Kan. at 562.

*Turner's California assault with a firearm conviction*

The first conviction Turner alleges was misclassified is his California conviction for assault with a firearm on a person under California Penal Code § 245(a)(2), which

30

criminalizes "an assault upon the person of another with a firearm." California Penal Code § 240, in turn, defines "assault" as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." In Kansas, assault is defined as "knowingly placing another person in reasonable apprehension of immediate bodily harm." K.S.A. 2021 Supp. 21-5412(a). An assault involving a deadly weapon constitutes aggravated assault. K.S.A. 2021 Supp. 21-5412(b)(1).

Turner's presentence investigation (PSI) report classified his California assault with a firearm on a person conviction as an adult person felony. In support of this classification, the State argued below that this conviction was comparable to the crime of aggravated assault under K.S.A. 2021 Supp. 21-5412(b)(1).

On appeal, Turner argues the crimes of assault with a firearm on a person under California Penal Code § 245(a)(2) and aggravated assault under K.S.A. 2021 Supp. 21-5412(b)(1) are not comparable. Turner notes that while under the Kansas statute the victim must be aware of the danger, there is no such requirement under the California statute. To be guilty of assault with a firearm on a person under California law, the offender need only attempt to commit a violent injury on the person of another and have the present ability to do so. Turner also cites to *State v. Louis*, No. 121,339, 2020 WL 1814475 (Kan. App. 2020) (unpublished opinion), as persuasive authority that these two statutes are not comparable. While the procedural history of that case required the panel to apply the pre-*Wetrich* standard in comparing California Penal Code § 245(a)(2) and K.S.A. 2021 Supp. 21-5412(b)(1) (previously K.S.A. 21-3410), Turner is correct that the analysis in that case seems to imply the two statutes are not comparable under *Wetrich*. See *Louis*, 2020 WL 1814475, at *2-4.

The elements of California Penal Code § 245(a)(2) are broader than K.S.A. 2021 Supp. 21-5412(b)(1). A hypothetical advanced by Turner proves this fact. A person could try to shoot someone and miss without the victim knowing of the attempt and be guilty of

31

assault with a firearm on a person in California. The same conduct would not satisfy the elements of aggravated assault under Kansas law, however, because of the victim's ignorance as to the attempt.

The State seemingly concedes these two crimes are not comparable under *Wetrich*, arguing instead that Turner's California assault with a firearm on a person conviction should be compared to the Kansas offense of attempted battery or attempted aggravated battery under K.S.A. 2021 Supp. 21-5413. Returning to the hypothetical put forth by Turner, the State notes that shooting at someone and missing would constitute an attempted battery or attempted aggravated battery under Kansas law.

Because K.S.A. 2021 Supp. 21-6811(e)(3) calls for classifying out-of-state convictions based on reference to "comparable *offenses* under the Kansas criminal code," we may look to more than one Kansas offense in determining whether Turner's conviction was properly classified. (Emphasis added.) See, e.g., *State v. Williams*, No. 114,778, 2019 WL 406296, at *4-5 (Kan. App. 2019) (unpublished opinion) (comparing Nevada domestic violence statute with both Kansas domestic violence and battery statute).

K.S.A. 2021 Supp. 21-5413(a)(1) defines "battery" as "knowingly or recklessly causing bodily harm to another person." K.S.A. 2021 Supp. 21-5413(b), in relevant part, defines "aggravated battery" as knowingly or recklessly "causing great bodily harm to another person or disfigurement of another person" or knowingly or recklessly "causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2021 Supp. 21-5301(a) defines "an attempt" as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."

32

In arguing the California crime of assault with a firearm on a person is like the Kansas crimes of attempted battery or attempted aggravated battery, the State seemingly relies on a transitive argument. The State first claims the requisite intent for the commission of assault with a firearm on a person under Cal. Penal Code § 245(a)(2) "is the intent to commit a battery." *People v. Griggs*, 216 Cal. App. 3d 734, 740, 265 Cal. Rptr. 53 (1989) (citing *In re Jose R*., 137 Cal. App. 3d 269, 275, 186 Cal. Rptr. 898 [1982]). As the State notes, another panel of this court has held that the California and Kansas battery statutes are comparable. *Williams*, 2019 WL 406296, at *2-4. The implication thus being that if assault and battery require the same intent under California law, and the California and Kansas battery statutes are comparable, then the California crime of assault with a firearm on a person must be like the Kansas crime of attempted battery.

In response, Turner notes that although California law defines an assault as "an unlawful *attempt*, coupled with a present ability, to commit a violent injury on the person of another," the term "attempt" as it used in Cal. Penal Code § 240 requires a different mental state than that required for attempted battery or aggravated battery under Kansas law. To prove a criminal attempt under Kansas law, the State must show that the defendant had the specific intent to commit the intended crime. See K.S.A. 2021 Supp. 21-5301(a). In contrast, Turner claims, the term "attempt" as used in California's definition of assault does not require a specific intent to injure the victim. Rather, assault is a general intent crime in California. *People v. Williams*, 26 Cal. 4th 779, 788, 111 Cal. Rptr. 2d 114, 29 P.3d 197 (2001).

In support, Turner points out that in arguing the requisite intent for assault under California law is the same as battery, the State cites caselaw that is several decades old and from a lower appellate court. Since then, Turner claims, the California Supreme Court has clarified the requisite mental state for assault with a firearm on a person.

In *Williams*, the California Supreme Court clarified the mental state required for assault, explaining it is a general intent crime. The court held:

> "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." 26 Cal. 4th at 790.

Thus, "[f]or example, a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." 26 Cal. 4th at 788 n.3.

In Kansas, attempted battery and attempted aggravated battery are specific intent crimes. "K.S.A. 2020 Supp. 21-5301(a) thus plainly requires the State, when prosecuting an attempted crime, to prove that the defendant possessed the specific intent to commit the underlying offense." *State v. Mora*, 315 Kan. 537, 542, 509 P.3d 1201 (2022).

Turner points to two ways in which the crime of assault with a firearm on a person is broader than the Kansas offenses of attempted battery and attempted aggravated battery. First, acts that could cause a battery, even if there is no specific intent to commit a battery, qualify as assault in California but not as attempted battery in Kansas. Adding to his first hypothetical, Turner gives the example of a person who shoots in the direction of another person as they walk away, intending to miss. This could qualify as an assault under California law. See, e.g., *Williams*, 26 Cal. 4th at 790 (warning shot fired in victim's vicinity met the requirements of assault). It would not, however, qualify as either assault or attempted battery or attempted aggravated battery in Kansas, as the person was not subjectively put in fear and there was no specific intent to commit a battery. Secondly, Turner correctly notes that while intoxication is a defense to attempted battery

34

under Kansas law, it is unavailable as a defense to assault under California law. See *State v. Gallegos*, 313 Kan. 262, 271, 485 P.3d 622 (2021) (voluntary intoxication may negate the intent element of a specific intent crime); *Williams*, 26 Cal. 4th at 789 (voluntary intoxication not available as a defense to assault).

*Turner's California robbery conviction*

Turner also claims the district court erred in classifying his California robbery conviction as a person felony. Turner's PSI report listed his California robbery conviction as an adult person felony. The State concedes the district court erred in classifying this conviction as a person felony and argues only that this fact demonstrates "the absurd results that stem from *Wetrich*'s interpretation of 'comparable.'"

California law defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211. K.S.A. 2021 Supp. 21-5420(a) defines robbery as "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person."

As we have repeatedly recognized, because robbery under California law can be accomplished by threat of damage to property, the California robbery statute is broader than its Kansas counterpart. See, e.g., *State v. Billoups*, No. 120,040, 2020 WL 1969356, at *17 (Kan. App. 2020) (unpublished opinion) (applying *Wetrich* and finding California robbery broader than Kansas robbery); *State v. Barnes*, No. 119,582, 2019 WL 3518899, at *3 (Kan. App. 2019) (unpublished opinion) (same). So Turner's California robbery conviction cannot be considered a person felony when calculating his criminal history score.

CONCLUSION

Because both Turner's California assault with a firearm on a person and California robbery convictions were improperly classified as person felonies, the district court erred in sentencing him. At sentencing, Turner's criminal history was improperly calculated as category A. With these convictions properly classified as nonperson felonies under *Wetrich*, Turner's criminal history includes one person felony and six nonperson felonies, placing him in category C. See K.S.A. 2021 Supp. 21-6809. While we affirm his convictions, we vacate his sentence and remand his case for resentencing.

Convictions affirmed, sentence vacated, and case remanded with directions.

\* \* \*

MALONE, J., concurring in part and dissenting in part:  I agree with the majority's resolution of all issues in this appeal except for the majority's decision that the district court did not err in denying Cardell Turner's motion for new trial based on ineffective assistance of counsel. A district court may grant a new trial to a defendant "if required in the interest of justice." K.S.A. 2021 Supp. 22-3501(1). The district court should have granted Turner's motion for new trial because his trial counsel failed to request a jury instruction on self-defense—an instruction that was legally and factually appropriate and would have provided Turner with his only chance of acquittal at trial.

I will begin by trying to succinctly state the pertinent facts. Turner admitted that he worked for a drug cartel and came from California to Wichita to collect money from Alberto Alfaro. Turner was in a black BMW waiting outside Alfaro's home and observed Alfaro and Enrique Umana Somoza trying to jump-start a truck. Turner had a pistol on his lap that he claimed he used for protection because his job required him to carry large sums of money, but he testified he did not intend to use the weapon against Alfaro and

36

Somoza. Turner testified that when he pulled next to the truck, Alfaro spun around holding a gun and pointed it at him. Turner testified that he then raised his pistol and pulled the trigger "because I thought [Alfaro] was going to shoot." Turner's pistol malfunctioned, causing Alfaro to laugh at Turner, at which point Turner drove off. Alfaro denied having a weapon or pointing a gun at Turner.

At trial, the State introduced recorded phone conversations between Turner and Rogelio Velasquez in which they discussed Turner collecting the drug money from Alfaro. In one call, Turner said he had located Alfaro standing outside his truck, but he "can't do nothing" because he was driving and "there is too many people out here waiting." Velasquez responded by telling Turner to go up while the man was under his hood and "do yo thing and just jump on the motherfuckin' freeway." Turner expressed concern that there were so many people around the police would get a description of his car. In another phone call, Turner told Velasquez "that fat boy . . . he might have to go too" because he had seen Turner's face.

Turner did not request a self-defense jury instruction. At the jury instruction conference, the district court asked Turner's counsel if he wanted a jury instruction on self-defense, and counsel responded no. The district court then stated it would not give the instruction, in part, because "it is not being requested." At the motion for new trial, when Turner's counsel was asked about whether he considered asking for a self-defense instruction, counsel responded that he did not believe the instruction was warranted and "[f]rankly, I didn't think we were going to get it."

As the majority acknowledges, a self-defense instruction was legally and factually appropriate under the evidence presented at the trial. But because Turner did not request the instruction, the district court's failure to give it is reviewed for clear error. K.S.A. 2021 Supp. 22-3414(3). To establish clear error, the party alleging the error must convince the appellate court the jury would have reached a different verdict without the

37

error. *State v. Douglas*, 313 Kan. 704, 710, 490 P.3d 34 (2021). Like my colleagues in the majority, I am not *convinced* that the verdict here would have been different had the district court properly instructed the jury on self-defense.

But the standard for determining reversibility is different on a claim of ineffective assistance of counsel. To establish ineffective assistance of counsel, a defendant must first show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Next, the defendant must establish prejudice by showing there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *State v. Butler*, 307 Kan. 831, 852-53, 416 P.3d 116 (2018).

In his motion for new trial, Turner claimed his counsel was ineffective for many reasons including failing to request a jury instruction on self-defense. After the parties presented evidence, the district court found that Turner's counsel's performance was not deficient and, even if it were, Turner had failed to establish prejudice.

The majority concedes that given the evidence, counsel's failure to request a jury instruction on self-defense was "objectively unreasonable." I agree with this assessment, but quite frankly, I think it is an understatement. Turner testified that the only reason he raised his pistol and pulled the trigger in his encounter with Alfaro was because Alfaro spun around and pointed a gun at him, and he thought Alfaro was going to shoot. A self-defense instruction was legally and factually appropriate, and counsel's failure to request it cannot be considered reasonable trial strategy. Under the circumstances, I'm perplexed by counsel's testimony that he did not believe a self-defense instruction was warranted and that he did not think the district court would give the instruction had he asked for it. As the majority opinion thoroughly analyzed, the district court committed error, but not

clear error, by failing to sua sponte instruct the jury on self-defense. The district court declined to give the instruction, in part, because Turner's counsel did not request it.

I part company with the majority in its finding that Turner failed to show prejudice caused by his counsel's deficient performance. Based on the evidence presented at trial, self-defense was Turner's best and only real defense to the charges. Turner admitted in his testimony that he raised his pistol and pulled the trigger, but he only did so because Alfaro pointed a gun at him, and Turner thought he was going to shoot. In closing argument, without a self-defense instruction, Turner's counsel argued that Turner was only there to pick up money from Alfaro and not to kill him. But this argument alone was unavailing because Turner admitted that he tried to fire his pistol and the weapon malfunctioned—he needed a self-defense instruction to have any chance for the jury to find the attempted shooting was justified.

Turner's case is like *State v. Dinkel*, 314 Kan. 146, 495 P.3d 402 (2021). In that case, Dinkel challenged the effectiveness of her trial counsel after being convicted of rape of a child under 14. During the trial, defense counsel presented evidence that it was the male victim who initially raped Dinkel, and he then blackmailed Dinkel into committing further sexual acts. On appeal, Dinkel argued that her counsel was ineffective for failing to request an instruction on the voluntary act requirement of the rape charge, given her defense to the charge. Dinkel acknowledged that her counsel requested instructions on the elements of rape and blackmail, but she contended this was different from arguing the voluntariness issue and requesting an instruction on the actus reus of the charged crime. The case was remanded for an evidentiary hearing on Dinkel's claims, but the district court found that defense counsel had not been ineffective.

The Supreme Court agreed with Dinkel, holding that counsel was ineffective for failing to request the instruction and for failing to develop a defense that engaged the voluntary act requirement. 314 Kan. at 154. The court found that counsel's performance

39

was deficient because it left the jury with no way to apply Dinkel's forcible rape defense. 314 Kan. at 154. Moving on to consider whether this deficiency prejudiced Dinkel, the court observed that Dinkel admitted to at least one instance of sexual intercourse with the male victim, but no instruction told the jury that Dinkel was not guilty if she was forcibly raped. The court found the absence of an instruction permitting the jury to apply Dinkel's defense was prejudicial. 314 Kan. at 154. The court stated: "The failure to give the jury the tools it needed to apply Dinkel's defense against the State's case made it impossible to achieve the fundamental fairness we expect in a criminal trial." 314 Kan. at 154.

Turner's counsel presented evidence to the jury that warranted an instruction on self-defense. Turner testified on direct examination that he tried to fire his pistol and the weapon malfunctioned—the actus reus of the attempted murder charges—but he did so only because Alfaro pointed a gun at him, and Turner thought he was going to shoot. As in *Dinkel*, Turner's counsel urged the jury to find Turner not guilty but offered them no avenue to do so. While counsel presented Turner's version of the events to the jury, nothing in his arguments or the instructions told the jury how it could use that information to acquit him. Counsel's failure to request a jury instruction on self-defense—Turner's best and only real defense to the charges against him—made it impossible to achieve the fundamental fairness we expect in a criminal trial.

I conclude that Turner sufficiently showed prejudice caused by his counsel's deficient performance in not requesting a jury instruction on self-defense. The evidence in the recorded phone calls incriminated Turner, but it did not establish his guilt of the charges. Perhaps the jury would have rejected Turner's claim that he pulled the trigger in self-defense, but one thing is for sure—he had no chance of an acquittal without a self-defense instruction. Counsel's failure to request a jury instruction on self-defense amounted to deficient performance sufficient to undermine my confidence in the outcome of Turner's trial. See *Butler*, 307 Kan. at 852-53 (defining reasonable probability that the result of the trial would have been different as a probability sufficient to undermine

confidence in the outcome). As a result, I would find that the district court erred in denying Turner's motion for new trial based on ineffective assistance of counsel.