IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,895

STATE OF KANSAS,
*Appellee*,

v.

MONDALE LE'ON DOUGLAS,
*Appellant*.

SYLLABUS BY THE COURT

1.

The doctrine of invited error precludes a party from asking a district court to rule in a given way and then challenging that ruling on appeal. The doctrine's application turns on whether the record reflects the party's action in fact induced the court to make the claimed error.

2.

An appellate court reviews an instructional error claim in multiple steps. First, the court decides whether the issue was properly preserved below. Second, it considers whether the instruction was legally and factually appropriate. In doing so, the court exercises unlimited review of the entire record and views the evidence in the light most favorable to the requesting party. And, finally, when the reviewing court finds error, it determines whether that error is reversible.

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Opinion filed July 2, 2021. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Daniel G. Obermeier*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: MonDale Le'on Douglas appeals from convictions on three counts of first-degree premeditated murder. He raises two instructional error claims and one prosecutorial error claim. We affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

On April 3, 2018, a friend arrived at Edward Rawlins' house and found him in the entryway, dead from a gunshot wound. Investigating officers discovered Addrin Coates' body in the bedroom and David Rawlins' body in the kitchen. Edward was shot four times, including twice in the head. Two of those four shots were fired within 5 feet. Coates was shot four times, including once in the back of the head. David was shot six times, including three to his head.

A next-door neighbor heard three distinct "chunks" of gunfire, totaling about 17 shots, the night of April 2. She recalled this happening about 10 p.m. Before the first chunk, she heard loud voices and screaming that she believed to be an argument among two or three men. She thought the argument lasted about five minutes before the gunshots.

Police found two piles of six shell casings each. One pile was just outside the front door, and the other was in the hallway where Coates was found. At trial, a detective

2

testified this shell casing evidence implied two things: the shooter used a revolver since a semiautomatic gun would have left spent casings spread about after bouncing around, and the revolver was reloaded at least twice.

The shell casings were of a rare 32-20 caliber, originally developed in the 1880s. Police believed the recovered casings to be from new cartridges made in the antique caliber, based on their new appearance. Investigators learned Cabela's in Kansas City, Kansas, sold 32-20 cartridges. Videotape and other evidence showed Douglas bought a box of Black Hills Ammunition's 32-20 cartridges at that store around 3:45 p.m. on April 2.

Surveillance videos both inside and outside an apartment complex where Douglas lived captured his movements on April 2. It showed he left his apartment building around 9:40 p.m., heading northwest generally towards the murder scene. He came back about 10:27 p.m. and left again at 10:43 p.m., wearing a different jacket, pants, and shoes. He then returned and could be seen leaving the front door of the apartment building at 11:10 p.m. carrying what seemed to be two plastic grocery bags. He returned about two minutes later without the bags; it appeared he took them to a nearby dumpster. A detective testified that when police arrested Douglas a few days after the shooting, he was taking out his trash, but this time he used a dumpster directly behind the back door of the building, where "residents [were] instructed to [put] their trash."

Police searching Douglas' apartment recovered gloves consistent with those Douglas wore on the April 2 video but found no gun, bullets, or the first ensemble of shoes, pants, and jacket Douglas wore before 10:43 p.m. The jacket was later retrieved from his uncle's apartment. The dumpster had been emptied and the contents taken to the dump before police realized they should have searched it.

Police also seized Douglas' cell phone, which ended in a 9727 number. On April 2, between 7:19 p.m. and 8:27 p.m., two of the victims' phones were used to try contacting his number: two outgoing calls from one phone and four texts from the second. The texts were not introduced into evidence.

The State charged Douglas with three counts of first-degree premeditated murder. The jury found him guilty on all counts. The court ordered three hard 50 sentences to run consecutive. Douglas directly appeals to this court. Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 2020 Supp. 22-3601); K.S.A. 2020 Supp. 22-3601(b)(3)-(4) (life sentence and off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 2020 Supp. 21-5402(b) (first-degree murder is off-grid person felony).

INVITED ERROR

Douglas argues the trial court committed reversible error by failing to instruct the jury on both second-degree intentional murder and voluntary manslaughter as lesser included offenses. But the State asserts the invited error doctrine as a preliminary matter to preclude these claims. We consider that first.

Under our caselaw, if the invited error doctrine applies we need not reach the merits of Douglas' instructional error arguments. See *State v. Fleming*, 308 Kan. 689, 701, 423 P.3d 506 (2018) ("Kansas courts do not review for clear error . . . when the invited-error doctrine applies . . . to claimed errors in a jury instruction."). The doctrine's application is a question of law over which an appellate court has unlimited review. *State v. Sasser*, 305 Kan. 1231, 1235, 391 P.3d 698 (2017).

4

*Additional facts*

At the jury instruction conference, the trial court asked defense counsel if any lesser included offense instructions were being requested. Counsel responded, "I know that I am not requesting any lesser included offenses and indeed there may not be any applicable ones either." The court agreed and noted:

> "Based on the facts that we have today, I do not believe that there is any applicable lesser [included offenses], so I concur with your comments. . . . [F]or example, there's no indication that there was an argument, that there was a fist fight. Well, let me rephrase that. There was by the young girl who testified, [the neighbor], indicated that she heard loud voices or yelling. So there was an argument, but there's certainly not anything sufficient to show a self-defense, et cetera."

*Discussion*

"The doctrine of invited error precludes a party from asking a district court to rule a given way and thereafter challenging the court's ruling on appeal." *State v. Soto*, 301 Kan. 969, 983, 349 P.3d 1256 (2015). That party's actions inducing a court to make the claimed error and the context in which those actions occurred must be scrutinized to decide whether to employ the doctrine. But there is no bright-line rule for its application. *Fleming*, 308 Kan. 689, Syl. ¶ 4. A mere failure to request an instruction does not trigger invited error, but when a defendant actively pursues what that defendant later argues to be an error, the doctrine applies. *State v. Cottrell*, 310 Kan. 150, 162, 445 P.3d 1132 (2019).

Our issue here is whether simply saying, "I am not requesting any lesser included offenses," is something more than a mere failure to request an instruction. If so, the

doctrine bars appellate review. See *State v. Dern*, 303 Kan. 384, Syl. ¶ 4, 362 P.3d 566 (2015).

Douglas did not file a reply brief responding to the State's invited error argument. For its part, the State claims "[d]efense counsel appears to have adopted an 'all or nothing' tactic" and argues invited error should apply. It relies on *State v. Angelo,* 287 Kan. 262, 279-80, 197 P.3d 337 (2008), in which the defense attorney stated his defense strategy was "'all-or-nothing,'" and the defendant twice told the court personally he did not want such an instruction—even after acknowledging he could not appeal from the consequences of his choice. 287 Kan. at 279-80. But unlike *Angelo*, the record does not show an all-or-nothing defense tactic, nor does it reflect Douglas personally insisted he did not want lesser included instructions. *Angelo* is a factually stronger case for invited error than what we have here.

Both *State v. Walker*, 304 Kan. 441, 372 P.3d 1147 (2016), and *State v. Jones*, 295 Kan. 804, 286 P.3d 562 (2012), are helpful. In *Walker*, the district court decided a second-degree murder instruction was inappropriate, noting the defense had not requested any lesser included offense instructions. Counsel confirmed that. The *Walker* court held that when defense counsel neither makes an affirmative request to omit lesser included offense instructions nor declines the court's offer to give them, the defendant does not invite an error. 304 Kan. at 445 (reasoning that defendant "merely acquiesced to the district court's ruling; he did not invite it").

But in *Jones*, the trial court showed its willingness to instruct on the lesser included offense of second-degree murder, and the defense objected to giving it. *Jones*, 295 Kan. at 812. The court explained the distinction between first-degree murder and second-degree murder and told Jones the possible consequence he would face if convicted of the former. Jones then personally agreed to not giving the lesser included

offense instruction. On appeal, the *Jones* court held invited error precluded appellate review under these circumstances. 295 Kan. at 813.

What *Walker* and *Jones* show is that the doctrine's application turns on whether the instruction would have been given—or omitted—but for an affirmative request to the court for that outcome later challenged on appeal. The *Walker* court provided two circumstances in which invited error may apply—(1) affirmative request to omit and (2) affirmative rejection of the court's offer to give. The ultimate question is whether the record reflects the defense's action *in fact induced* the court to make the claimed error. In *Walker*, the record showed the district court initially ruled the instruction was inappropriate, so regardless of the defense's action the instruction would not have been given. On the other hand, in *Jones*, the record showed the district court believed the instruction was appropriate and expressed a willingness to give it, but the defense asked to omit it. So in *Jones*, the defense's action in fact caused the error. See *State v. Peppers*, 294 Kan. 377, 393, 276 P.3d 148 (2012) (applying invited error when the district court noted it "would not give the instruction if either side objected," and defense counsel expressed no objection to giving it).

Douglas' case is a bit murkier. The court simply asked defense counsel, "Do you believe any lesser included offenses are applicable or are you requesting any?" Counsel replied: "I know that I am not requesting any lesser included offenses and indeed there may not be any applicable ones either." The State then confirmed it was not asking for any lesser included instructions, and the court ruled, "Based on the facts that we have today, I do not believe that there is any applicable lesser [included offenses], so I concur with your comments."

Under these facts, we cannot conclude defense counsel induced the district court's decision not to give lesser included offense instructions. We hold the invited error

7

doctrine does not bar our consideration of the jury instruction challenges advanced by Douglas.

## THE SECOND-DEGREE INTENTIONAL MURDER INSTRUCTION CLAIM

Douglas argues a second-degree intentional murder instruction was both factually and legally appropriate, making it error not to give the instruction. We hold any error was not reversible.

*Standard of review*

An appellate court addresses an instructional error issue in multiple steps. First, the appellate court decides whether the issue was properly preserved below. Second, the court considers whether the instruction was legally and factually appropriate. In doing so, it exercises unlimited review of the entire record and views the evidence in the light most favorable to the requesting party. Third, upon a finding of error, it determines whether that error is reversible. *State v. Harris*, 310 Kan. 1026, 1034, 453 P.3d 1172 (2019).

The first step affects the third one because an unpreserved issue will be reviewed for clear error under K.S.A. 2020 Supp. 22-3414(3): "No party may assign as error the . . . failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless . . . the failure to give an instruction is clearly erroneous." To establish clear error, "the party claiming it [must] convince the court the jury would have reached a different verdict without the error." *Harris*, 310 Kan. at 1034.

*Discussion*

Douglas' instructional error claim is unpreserved. And the instruction was legally appropriate because second-degree intentional murder is a lesser included offense of first-

8

degree premeditated murder. *State v. Stanley*, 312 Kan. 557, 566, 478 P.3d 324 (2020); see also K.S.A. 2020 Supp. 21-5402(a)(1) (defining first-degree premeditated murder as "the killing of a human being committed . . . [i]ntentionally, and with premeditation"); K.S.A. 2020 Supp. 21-5403(a)(1) (defining second-degree intentional murder as "the killing of a human being committed . . . [i]ntentionally"). "In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to . . . such lesser included crime." K.S.A. 2020 Supp. 22-3414(3). We assume without deciding that the unrequested second-degree intentional murder instruction was factually appropriate and directly move to a harmless error analysis.

The only element distinguishing premeditated first-degree murder from the lesser crime of intentional second-degree murder is the former's additional premeditation requirement. *Soto*, 301 Kan. at 985-86. Douglas asserts the evidence—especially, the neighbor's testimony about hearing angry voices and arguing before the shooting— supported a finding of second-degree intentional murder, making the trial court's failure to give the instruction clearly erroneous. The State counters that its premeditation evidence "was exceedingly strong," so Douglas cannot establish clear error for failing to give the instruction. We agree with the State.

When there is overwhelming evidence of premeditation, a defendant will fail to firmly convince an appellate court that a jury would have found the defendant guilty of second-degree intentional murder if the lesser included instruction had been offered. See *Walker*, 304 Kan. at 446-47; *Soto*, 301 Kan. at 989-90. "'[I]t is not necessary that there be direct evidence of either intent or premeditation. Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable.'" *State v. Killings*, 301 Kan. 214, 223, 340 P.3d 1186 (2015). In considering circumstantial evidence, our caselaw identifies several factors in

9

determining whether evidence gives rise to an inference of premeditation. They are: "'(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.'" 301 Kan. at 223-24. In some cases, just one factor may supply overwhelming evidence of premeditation. 301 Kan. at 224.

Here, overwhelming evidence supports premeditation, particularly factors one, three, and five. Douglas purchased ammunition roughly six to seven hours before the killings. See *Soto*, 301 Kan. at 988-89 ("Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation."); *State v. Smith*, 258 Kan. 321, 327, 904 P.2d 999 (1995) (evidence showing defendant "purchased a larger caliber gun than he had previously owned and ammunition" one day before the shooting may support premeditation). All victims were shot in the head and shot repeatedly. See *Killings*, 301 Kan. at 224 (shooting victim multiple times may support premeditation). Douglas would have to have reloaded the revolver at least twice. See *Smith*, 258 Kan. at 327-28 (evidence showing defendant reloaded his gun while shooting may support premeditation). And after the killing, Douglas appeared to dispose of the revolver and the clothes he was wearing on that day. See *State v. Hill*, 233 Kan. 648, 653, 664 P.2d 840 (1983) (burning the clothing defendant was wearing and trying to clean up the crime scene may support premeditation).

Given this evidence and its strength, Douglas fails to convince us the result would have been different had a second-degree intentional murder instruction been given. Failure to give this instruction was not clearly erroneous.

## THE VOLUNTARY MANSLAUGHTER INSTRUCTION CLAIM

Douglas next claims error from the district court's failure to give a voluntary manslaughter instruction. This instruction was legally appropriate. See *State v. Uk*, 311 Kan. 393, 397, 461 P.3d 32 (2020) (voluntary manslaughter is a lesser included offense of first-degree premeditated murder); K.S.A. 2020 Supp. 21-5404 (a)(1) ("Voluntary manslaughter is knowingly killing a human being committed . . . [u]pon a sudden quarrel or in the heat of passion."). And we will again assume error and move to the final step to consider whether the court's failure amounted to clear error.

Again, our attention is drawn to the same overwhelming evidence supporting the first-degree murder convictions we previously discussed, and, in particular, the evidence the crimes were premeditated. We hold failure to give a voluntary manslaughter instruction was not clearly erroneous.

## THE PROSECUTORIAL ERROR CLAIM

During closing argument, the prosecutor used the rhetorical phrase "we know" many times. Douglas claims the prosecutor offered his personal opinion in doing so. We agree in one instance but hold it was not reversible error.

*Standard of review*

Appellate courts employ a two-step analysis for reviewing prosecutorial error claims.

> "[The] two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to

11

conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

*Additional facts*

Even though the prosecutor used the phrase "we know" many times, Douglas complains about four of them. First, the prosecutor used the phrase when telling the jury evidence was presented to show where, when, and how the crime happened. He said:

"I wish I could fill in all the gaps for you. *We know* the where certainly, *we know* the when, you've seen some of the how. . . . [W]e probably will never know why, but that's not what you guys are here to make a determination about. It's about the what and the who." (Emphasis added.)

Second, the prosecutor used the phrase when discussing the evidence showing the victims tried to call Douglas before they were killed:

"You heard evidence multiple text messages, multiple phone calls. You saw it on the call log, saw a picture. They are communicating, they're attempting to reach him, both Edward and David. You heard Detective Bundy tell you *we know* that they're calling the 9727 number, and that's Mondale's. And we're not guessing at that. His mom told us that's his phone." (Emphasis added.)

12

Third, the prosecutor repeated a variation of the phrase when commenting about the ammunition evidence:

"So, ladies and gentlemen, *you know* where he bought the bullets, *you know* when he bought the bullets. The evidence tells you exactly what he did with those bullets. . . . That's Mr. Douglas shooting these men six times, pausing, dumping out those rounds, which is why they're in that nice neat pile outside, then he went in, fired six more, dumped out that pile that you see in the hallway, and then he fired, *we know*, at least four more." (Emphases added.)

Finally, during rebuttal, the prosecutor used the phrase, with the highlighted portion being the focus in Douglas' brief.

"[L]adies and gentlemen, why didn't he take the jacket and the gloves out to the trash? I don't know. *Why did he decide to kill three people? The why's are the things we may not know. But we know what he did*. We know he took some bags out, we know he took it to a dumpster across the street and we know where his dumpster is. You also know that he knows where his dumpster is because when he was arrested, he was taking out his trash normally." (Emphasis added.)

*Discussion*

The State asserts the prosecutor said "we know" only to discuss undisputed evidence, but that is not always the case.

Douglas' prosecutorial error claim is basically that in all four instances the prosecutor improperly expressed personal opinion. See *State v. King*, 308 Kan. 16, 417 P.3d 1073 (2018). And under *King*, our law is clear: "A prosecutor may argue the evidence demonstrates a defendant is guilty so long as the prosecutor does not state his or her personal opinion regarding the ultimate guilt or innocence of the defendant." 308

13

Kan. at 30. Generally, "'a prosecutor may not offer a jury the prosecutor's personal opinion as to the credibility of a witness because such a comment is unsworn, unchecked testimony, not commentary on the evidence of the case. The determination of the truthfulness of a witness is for the jury.'" 308 Kan. at 30-31.

"[A] prosecutor's use of 'we know' is acceptable when it 'does not indicate [the prosecutor's] personal opinion, but demonstrates that the evidence was uncontroverted.'" 308 Kan. at 34. A key question in Douglas' case is whether the prosecutor was appropriately "stating uncontroverted evidence," or whether he was instead "drawing inferences for the jury." The use of "'we know'" is error, if the prosecutor draws inferences for the jury regardless of whether "the inferences being drawn were reasonable." 308 Kan. at 34.

The first ("We know the where certainly, we know the when . . . . [W]e probably will never know why.") and the second ("we know that [the victims were] calling the 9727 number, and that's Mondale's") statements are discussing uncontroverted evidence. But the third one is a problem. The prosecutor said:

> "*[Y]ou know* where he bought the bullets, *you know* when he bought the bullets. The evidence tells you exactly what he did with those bullets. . . . That's Mr. Douglas shooting these men six times, pausing, dumping out those rounds, which is why they're in that nice neat pile outside, then he went in, fired six more, dumped out that pile that you see in the hallway, and then he fired, *we know*, at least four more." (Emphases added.)

The first two uses of "you know" discuss the uncontroverted video evidence, showing Douglas purchased ammunition at Cabela's. But the last one—"he fired, we know, at least four more"—is the prosecutor's personal opinion that Douglas was the killer. See, e.g., *King*, 308 Kan. at 34 (holding prosecutor improperly drew inference for

14

jury by using "'we know'"). Obviously, the jury could infer from the evidence that Douglas was the one who "fired" and murdered these three victims. And the State was free to argue the evidence warranted those inferences. But it was error for the prosecutor to assert these inferences were instead known facts based on undisputed evidence. This third instance constitutes error.

Finally, Douglas contends the fourth usage when the prosecutor said "'*we know what he did*,'" improperly conveyed personal opinion that "Douglas had fired the shots and killed three people." But when viewed in the broader context, this one is a rhetorical reference only to Douglas' known conduct based on uncontroverted proof, not the murders themselves. See *King*, 308 Kan. at 33 (appellate courts question a challenged comment in the context that it was made, rather than isolating the comment and considering it in the abstract). The statement was made during rebuttal in direct response to the defense's closing argument that Douglas did not dispose of the crime's evidence. Defense counsel argued:

> "I would submit to you that if Mr. Douglas was throwing away evidence of a crime, you know, taking out garbage bags and such, why wouldn't he have thrown away the gloves and the jacket? The glove is gonna be closer on the hand to where gunshot residue is produced and blood spatter. Neither of those were found on the glove. I'm just gonna ask you to consider that. If he's gonna throw away evidence of a crime, why not throw away the gloves and the jacket?"

And the prosecutor rebutted:

> "[W]hy didn't he take the jacket and the gloves out to the trash? I don't know. Why did he decide to kill three people*? The why's are the things we may not know. But we know what he did. We know he took some bags out*, we know he took it to a dumpster across the street and we know where his dumpster is. You also know that he knows where his

15

dumpster is because when he was arrested, he was taking out his trash normally."
(Emphasis added.)

In context, the prosecutor was not saying "we know" Douglas killed the victims in this fourth instance. Instead, he was arguing "we know" the evidence was uncontested that Douglas "took some bags out."

In sum, on the first, second, and fourth occasions, the prosecutor used the phrase "we know" to talk about undisputed evidence. They do not constitute error. But the third was error because the prosecutor conveyed his personal opinion about who killed the victims.

We move then to another harmless error analysis. Prosecutorial error is harmless if there is no reasonable possibility it contributed to the verdict. *Sherman*, 305 Kan. at 109. And once again, the strong circumstantial evidence supports Douglas' convictions. See *State v. Corbett*, 281 Kan. 294, Syl. ¶ 6, 130 P.3d 1179 (2006) ("A conviction for the gravest crime may be sustained by circumstantial evidence, which is any evidence that tends to prove a fact in issue by proving other events or circumstances which afford a basis for a reasonable inference by the jury of the occurrence of the fact in issue.").

The trial court properly instructed the jury that "[s]tatements, arguments, and remarks of counsel are intended to help [the jury] in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by the evidence, they should be disregarded." The court also properly instructed the jury to determine the elements the State would have to prove beyond a reasonable doubt to convict Douglas as charged. See *State v. Garcia-Garcia*, 309 Kan. 801, 817-18, 441 P.3d 52 (2019) (when strong evidence existed and district court properly instructed jury, error was harmless). And the record surrounding the jury

16

deliberations supports the conclusion that it considered the evidence rather than being swayed by the prosecutor's brief erroneous remark. As noted by the State, the jury did not return its verdicts immediately, but instead asked a question, had a break, and asked another question before finally reaching a verdict. We hold there is no reasonable possibility this single error contributed to the trial's outcome.

Finally, although Douglas made no cumulative error argument, we similarly conclude this error and the two assumed instructional errors, even collectively, do not produce the degree of prejudice necessary for reversal.

Affirmed.