IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,038

STATE OF KANSAS,
*Appellee*,

v.

RAYMOND CHERRY,
*Appellant.*

SYLLABUS BY THE COURT

1.

A prosecutor errs by using the phrase "we know" during closing argument when making inferences for the jury regarding controverted evidence.

2.

The length of time a district court allows a party to display admitted evidence falls within the discretion of the district court judge in policing their courtroom proceedings.

3.

The party being limited by the exclusion of evidence has the responsibility of proffering sufficient evidence to the trial court in order to preserve the issue on appeal.

4.

A district court's failure to secure a jury-trial waiver before accepting a defendant's stipulation is constitutional error.

5.

Delays attributable to the COVID-19 pandemic are weighed neutrally when considering the reasons for speedy trial delays.

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Oral argument held May 15, 2025. Opinion filed July 18, 2025. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Kendall S. Kaut*, assistant district attorney, argued the cause, and *Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: On January 23, 2019, Raymond Cherry, Alan Michael Hicks, and "Jane" set out to buy some marijuana from "Bob" and "Robin." On the way to Bob and Robin's apartment, Cherry and Hicks decided, because they did not normally buy marijuana from Bob, they would steal the marijuana instead. Once Cherry and Hicks arrived at the apartment, the robbery turned into a "drug deal gone wrong." Cherry held Bob, and two of Bob's guests, at gunpoint, while Hicks searched the back bedroom for marijuana. Bob and Cherry got into a fight, which resulted in Cherry shooting Bob in the face.

Cherry completely denied any involvement with the drug deal or the shooting. However, following a jury trial, Cherry was convicted of first-degree murder, aggravated robbery, conspiracy to commit aggravated robbery, two counts of aggravated assault, and criminal possession of a firearm by a convicted felon. This is Cherry's direct appeal from those convictions.

Earlier in the night, Hicks and Jane were together, and Hicks mentioned that he wanted to buy some more marijuana. However, Hicks' regular dealer was unavailable.

Jane knew Bob from high school and had seen him advertising to his friends on Snapchat that he had some marijuana for sale. Jane contacted Bob, and Bob agreed to sell her some marijuana that night.

Shortly thereafter, Cherry contacted Hicks to see if he wanted to smoke some marijuana. Hicks agreed, and Cherry told Hicks to pick him up at the 7-Eleven near Cherry's apartment so they could all go to Bob's. Before heading to pick up Cherry at the 7-Eleven, Hicks and Jane stopped at another gas station to buy some Doritos and cigars. Hicks was recorded on the gas station's security camera making this transaction while wearing a distinctive graphic red hoodie.

Next, Jane and Hicks drove to the 7-Eleven, and per Cherry's directions, parked in the last stall. Cherry got into the backseat of Jane's gold Chevrolet Malibu. Because Hicks didn't feel comfortable with Cherry sitting behind him, Hicks got out of the passenger seat and moved to the backseat. This general sequence of events was captured by the 7-Eleven's security video; however, Cherry was wearing a hood at the time so investigators were not able to positively identify Cherry on the tape. Although at trial, Jane identified Cherry on the video.

After picking Cherry up, the trio headed to Bob's. During the car ride, Cherry and Hicks smoked marijuana as well as a plastic tipped Black and Mild cigarillo. During this drive, Cherry asked Hicks if he wanted to rob Bob. Hicks agreed to the robbery because he didn't really know Bob.

Once at the apartment complex, Cherry and Hicks walked up to Bob's door. Cherry was wearing gloves and still smoking the Black and Mild cigarillo. They knocked on the door and Bob answered. Bob told Cherry he couldn't smoke inside, so Cherry put out the cigarillo and left the butt by the front door.

When Hicks and Cherry arrived, Bob and Robin were both home, along with four guests: "Emma," Jordan, Sami, and Oskar. At trial, Hicks, Robin, Emma, Jordan, Sami, and Oskar testified to a similar version of events. Emma and Jordan were in the bedroom playing video games while Bob, Robin, Sami, and Oskar were in the main living area hanging out and also playing video games.

Bob let Cherry and Hicks in the apartment, and they started discussing the details of the marijuana deal. After reaching an agreement, Robin went to the back bedroom to get the marijuana. After Robin went to the bedroom and shut the door behind her, Hicks asked to see Bob's 9mm pistol, asking if Bob was interested in selling the gun. Hicks had previously loaned his .380 pistol to a friend, but he had brought a realistic looking semi-automatic BB gun with him. Bob took the magazine out of his gun, and not realizing Hicks only had a BB gun, he traded Hicks his 9mm for the BB gun. Hicks testified at trial that he asked to see Bob's 9mm specifically to disarm Bob before the robbery. Immediately after the gun trade, Cherry pulled his own 9mm and told Hicks to "[r]un that shit," meaning to rob Bob and Robin.

Bob yelled to Robin not to open the door. Robin, Emma, and Jordan then locked themselves in a bathroom which adjoined the bedroom and armed themselves with aerosol cans. Hicks busted through the bedroom door and searched the bedroom looking for marijuana. Hicks was unable to access or take the bedroom safe, but did manage to take four Ziplock bags of marijuana.

While Hicks was in the back bedroom, Cherry was holding Bob, Oskar, and Sami at gunpoint in the front room. Oskar and Sami testified that Bob and Cherry got into a fight, and then Cherry shot Bob in the face at close range. After shooting Bob, Cherry held Oskar and Sami at gunpoint for a few minutes, until Hicks had finished searching the bedroom. Once Hicks had finished, Cherry and Hicks left the apartment and returned to Jane's car. Oskar and Sami fled the apartment by climbing down a drainpipe near the

balcony. Jordan, Robin, and Emma ran to the living room and Robin began to perform CPR on Bob. Robin and Emma called 911, while Jordan attempted to get rid of any remaining drugs in the apartment.

While on the drive home, Cherry and Hicks initially agreed to split the marijuana, then Cherry offered to trade some marijuana for Bob's gun. Hicks agreed, but when Jane dropped Cherry off near his apartment, Cherry failed to take Bob's gun with him. Hicks, realizing the gun was still in the car, had Jane pull over on a residential street, wrapped Bob's gun in his graphic red hoodie, and stashed the gun in a storm drain. Fortunately, this event was caught on a neighbor's RING camera and reported to law enforcement.

Robin identified Jane from Snapchat to law enforcement. Officers stopped Jane, connected Hicks and Jane, and connected Hicks' and Jane's phone records to Cherry. When officers initially interviewed Cherry, he denied knowing Hicks or Jane. Cherry later admitted to knowing and having smoked marijuana with Hicks and deleting calls between them from his phone. Cherry claimed that he had been home all night with his then-girlfriend (who would later become his wife). At trial, Cherry's wife corroborated his account.

The gun and hoodie Hicks stashed in the storm drain were recovered by law enforcement, and DNA on the hoodie matched Hicks. Officers also found Hicks' fingerprints on Robin's bedroom door. Law enforcement also recovered the Black and Mild cigarillo butt from the front door of the apartment. DNA recovered from the cigarillo butt matched Cherry and Hicks.

A jury found Cherry guilty on all counts and the district court sentenced Cherry to a hard 25 for felony murder plus 72 months for aggravated robbery, to be served consecutively, with the remainder of the sentences to be served concurrently. Cherry directly appeals, maintaining that his is a case of mistaken identity.

He argues that several of the prosecutor's "we know" statements were prosecutorial error, that the prosecution's display of blood spatter photographs was prejudicially long, that the district court improperly kept him from questioning a witness in violation of his right to present a full and complete defense, that a stipulation of fact regarding his prior criminal history accepted without a jury trial waiver violated his jury trial rights, and that COVID-19 related delays resulted in a violation of his speedy trial rights.

DISCUSSION

*Prosecutorial Error*

Cherry alleges that four statements made by the State's attorney during closing argument amounted to reversible prosecutorial error. Specifically, Cherry argues that the State's repeated use of the phrase "we know" improperly announced the prosecutor's opinion on controverted evidence. The use of such "we know" statements is a practice we have repeatedly admonished prosecutors to avoid when discussing controverted facts. See, e.g., *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022); *State v. Alfaro-Valleda*, 314 Kan. 526, 537-41, 502 P.3d 66 (2022); *State v. Douglas*, 313 Kan. 704, 716, 490 P.3d 34 (2021); *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018).

An appellate court uses a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). For the first step, an appellate court assesses whether the prosecution exceeded its wide latitude to pursue a conviction and violated the defendant's right to a fair trial. *State v. Slusser*, 317 Kan. 174, 185, 527 P.3d 565 (2023).

6

> "If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process right to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

See also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021).

"The strength of the evidence may inform this inquiry, but it is not our primary focus, for prejudice may be found even in strong cases." *Brown*, 316 Kan. at 169.

If multiple harmless prosecutorial errors are found, the court considers the cumulative impact of those errors. The State has the burden to show beyond a reasonable doubt that the cumulative impact of the errors did not affect the verdict. *State v. Blevins*, 313 Kan. 413, 428, 431-33, 485 P.3d 1175 (2021).

This court has specifically addressed how to evaluate "we know" statements for error. In *Alfaro-Valleda*, we said:

> "[A] prosecutor's wide latitude does not extend to announcing the prosecutor's opinion on issues for the jury, including the defendant's guilt or innocence or witness credibility. . . . [A] prosecutor errs by using the phrase 'we know' during closing argument in the context of making inferences for the jury because that use conveyed the prosecutor's opinion, which is irrelevant. . . . [T]his holding applies 'even if the inferences being drawn were reasonable.' But use of a 'we know' statement is not prosecutorial error when the evidence being discussed is not controverted. [Citations omitted.]" 314 Kan. at 538.

With this framework for review in hand, we now turn to each of the statements Cherry alleges are error.

The first statement Cherry identifies is: "We know from their testimony that [Hicks and Jane] went to a convenience store. We know that they went to the Snack Pack or Snack & Pack, whatever it was called. We know that [] Hicks went inside and bought cigars. We know he was wearing that sweatshirt, that hoodie that night."

This first statement is not prosecutorial error. Cherry was not involved in this convenience store stop; Cherry's theory of defense focuses entirely whether he was involved in the murder, not Hicks' and Jane's actions. Cherry never contested whether Hicks and Jane went to get Doritos and cigars. Further, Hicks and Jane each testified to a similar version of events, and Hicks is clearly seen on the convenience store camera wearing the distinctive red graphic hoodie. By making this statement, the prosecutor was pointing to clearly verifiable parts of Hicks' and Jane's testimony. The prosecutor made no inference regarding controverted facts by making this statement, therefore the statement was not erroneous.

The second statement Cherry identifies is: "How do we know that it was Ray Cherry? Do we know that only because Hicks and [Jane] told you it was Ray Cherry?"

The State argues that because the statements were posed as a question, the prosecutor cannot be said to have been asserting his opinion that something was true. However, this court has explicitly rejected such blanket arguments before. See *Alfaro-Valleda*, 314 Kan. at 544 ("We also reject the State's attempt to distinguish *King*, [308 Kan. 16] and its progeny because the prosecutor couched the use of 'we know' in a question. This court has ruled a prosecutor's question to the jury can be error.").

8

The prosecutor here was arguing that "we know" Cherry was the other person in the apartment because Hicks' and Jane's testimony identified Cherry. The State argues that the prosecutor's statement related only to the "uncontroverted fact" that Hicks and Jane *testified* to Cherry's involvement. However, the substance of that testimony relates directly to the central issue in this case and the jury still needed to make its own finding. Cherry directly contradicted Hicks' and Jane's testimony by presenting evidence, in the form of his and his wife's testimony, that he was not at Bob's apartment that night. Therefore, the issue of the shooter's identity, and Cherry's involvement, was a controverted fact.

These are *precisely* the types of inferences this court has ruled constitute prosecutorial error. See *Alfaro-Valleda*, 314 Kan. at 542-43 ("'And what does that magazine contain? .380 ammo. And how do we know that? Because .380 ammo was what was surrounding the body of [Arita-Hurtado]. . . . And how do we know that it was the defendant? Well, when [Arita-Hurtado] left [his girlfriend's] house, he called [her].'").

In contrast, in *Barnes*, the defendant alleged that the prosecutor's statement that "we know" the killing was intentional and premeditated was error. However, we held those statements were not error because they referenced only uncontroverted facts based on the arguments being made in the particular case. *State v. Barnes*, 320 Kan. 147, 164-65, 563 P.3d 1255 (2025). "Rather than erroneously telling the jury that the matter of premeditation was settled, [the prosecution's] remarks instead accurately framed the issue on which the parties would later focus:  the killers' *identity* as 'the big disagreement in this case.'" 320 Kan. at 164. Unlike in *Barnes*, the State's "we know" statements here were made directly in reference to "the big disagreement in this case." Thus, we find this statement to be error.

The third statement Cherry argues is error was:

9

"Why do we know it was Ray Cherry? Because [Robin] told you it was Ray Cherry. She came into this courtroom. She started testifying. First she was looking towards the jury, but her eyes were constantly drawn back towards the defendant. I finally asked her, do you recognize anyone in this courtroom? . . . [S]he identified Ray Cherry as one of the men that came into her apartment that night."

This statement is of the same kind as the prior statement. Counsel was not only telling the jury that Robin's testimony identifying Cherry as the shooter constitutes fact, he is telling the jury that "we know" Cherry is the shooter because of Robin's demeanor in the court room. The identity of the shooter is "the big disagreement in this case." See 320 Kan. at 164. Put another way, it is uncontroverted that Robin believed and identified Cherry as the shooter; however, whether Cherry was *actually* the shooter is not something "we know." Making that factual finding is specifically the job of the jury. This statement is a prototype of an example of inserting a prosecutor's opinion "during closing argument in the context of making inferences for the jury." *Alfaro-Valleda*, 314 Kan. at 538.

The last statement Cherry argues is error is: "There is one other reason that we know it was Ray Cherry." The State concedes this statement constitutes prosecutorial error. Therefore, out of the statements Cherry asked this court to review, we find three instances of prosecutorial error.

The next step in our prosecutorial error framework is to evaluate whether those errors are harmless under the constitutional harmlessness test. "[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Sherman*, 305 Kan. at 109. Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmlessness test. 305 Kan. at 114.

Expert testimony, law enforcement testimony, first responder testimony, video evidence, and physical evidence each verified aspects of the testimony of all five victims who were in the apartment and also verified key aspects of Hicks' and Jane's testimony. This includes facts such as:  Bob removed the magazine from his gun and it was found on the counter; Hicks' BB gun was found at the apartment; Hicks' fingerprints were on the bedroom door; blood spatter and autopsy results indicated there had been a fight and Bob had been shot in the face at close range; someone had attempted to provide emergency care for Bob before first responders arrived; Hicks was caught on video stashing Bob's gun in a storm drain—and the gun was later recovered; and officers found the drugs Jordan had attempted to hide in a bush. The list could continue, but—as Cherry argues— the real question at trial was "who" shot Bob, not "what happened." Having established that the testimony regarding "what happened" at trial was fully corroborated, we look at the evidence presented of Cherry's involvement.

Three witnesses at trial specifically identified Cherry. Two of those witnesses were involved in the crime and were also facing felony-murder charges, the other witness was Robin—who was directly involved in the drug deal. Sami, Oskar, Emma, and Jordan all described the shooter as being about the same height, skin tone, hair style, and dressed similarly to how Hicks, Jane, and Robin said Cherry had been dressed. The way witnesses described Cherry as being dressed at the apartment generally matches what he was wearing on the surveillance footage from the 7-Eleven when getting into Jane's car. Cherry's DNA was found at Bob's apartment and also was determined to be consistent with DNA found on Jane's car door.

Beyond that, evidence Cherry put on in his defense—his and his wife's testimony—was heard by the jury and ultimately not deemed credible. Cherry's story changed over time. Though he initially denied knowing Hicks, he later admitted to having smoked marijuana with him before. Hicks testified that Cherry had also asked him

11

to write an affidavit stating that he didn't know Cherry, which he did, but admitted that was a lie and done before he realized there could be a case made against them. Cherry also claimed that the Black and Mild cigarillo butt was one he had left in Jane's ashtray from days before and speculated that someone else must have relit it and brought it to Bob's apartment. Cherry also admitted to having deleted calls from his phone between himself and Hicks. Cherry's wife testified that Cherry had been home the night of the murder. However, Cherry admitted that things weren't always smooth at home, and he didn't always stay at his (then girlfriend's) apartment—though he insisted he was there on January 23, 2019.

Because of the overwhelming weight of the evidence against Cherry, we find that the statements were harmless in light of the entire record. In finding these statements harmless we add a note of caution addressing an argument advanced by the State's counsel before this court. Counsel argued that he had found no cases where a "we know" statement had been found to be reversible error. We warn the State not to ignore our precedent finding these statements are error, even if those errors have been harmless up to this point. Harmlessness in each case is decided individually, in the context of the entire record. Even if the errors are individually harmless, they are included in our cumulative error analysis. Prosecutors are taking a gamble by continuing to use these types of statements, and those who gamble are bound to lose at some point. Indeed, in the time since this argument was made, that time has arrived. *State v. Wash*, 320 Kan. ___, ___, 2025 WL 1779068, at *19-20 (2025).

*Display of Blood Spatter Photographs*

Cherry next argues that the district court improperly allowed the State to display graphic photographs, which were properly admitted into evidence, for too long during expert testimony regarding blood spatter analysis. Cherry argues that the length of time the photographs were on display was unnecessary, prejudicial, and amounted to an abuse

of discretion by the district court. Cherry acknowledges that this is an argument of first impression for this court but analogizes his argument to those cases considering whether the admission of photographic evidence was prejudicial due to photos being "unduly repetitious, gruesome, or inflammatory." See *State v. Morris*, 311 Kan. 483, 492, 463 P.3d 417 (2020); *State v. Rodriguez*, 295 Kan. 1146, 1157, 289 P.3d 85 (2012). However, because Cherry does not contest the admissibility of the blood spatter photos, Cherry's reliance on this caselaw is misplaced.

The length of time a district court allows a party to display admitted evidence falls within the discretion of the district court judge in policing their courtroom proceedings. *State v. Turner*, 318 Kan. 162, 180, 542 P.3d 304 (2024) (defendant complained the district court judge cut him off during a hearing in a way that made him feel belittled; however, we acknowledged "judges have great leeway in controlling a courtroom"); *State v. Kahler*, 307 Kan. 374, 386, 410 P.3d 105 (2018) ("[A] trial judge has broad discretion in controlling the courtroom proceedings."); *State v. Hudgins*, 301 Kan. 629, 634, 346 P.3d 1062 (2015) ("The trial court has broad discretion in controlling voir dire in criminal cases."); *State v. Rochelle*, 297 Kan. 32, 36, 298 P.3d 293 (2013) (affirming the district court's decision to allow a six-year-old to testify with a "comfort person" next to her, the court held "the trial judge must keep order in the courtroom and has broad discretion in controlling courtroom proceedings"). As such, we review these decisions for an abuse of discretion.

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). In arguing that the length of the display was unreasonable, Cherry argues that the blood spatter analysis was not crucial to the State's case. Cherry, once again, argues that the question was "who" shot the victim and not "what happened." However, Cherry ignores that the State still bears the burden to prove every element of the crime. See *State v. Robinson*, 293 Kan. 1002, 1029, 270 P.3d

13

1183 (2012) ("[B]ecause the State has the burden to prove every element of the crime charged, photographs may be relevant to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, even if the cause of death is not contested."). The blood spatter testimony and analysis was used to show "what" happened and also used to corroborate witness testimony. The blood spatter analysis related to where Bob was shot, that Bob and the shooter had been in a struggle, and that someone had attempted CPR on Bob before the first responders arrived.

Notably, Cherry fails to mention *how long* the photos were actually displayed. The transcripts show only approximately three-and-a-half pages of discussion regarding the photos. The record also shows that the State's attorney was aware of the graphic nature of the photos and acted accordingly. The State's attorney asked the expert to be brief: "I'm going to ask you to very briefly . . . describe the area that you're looking at just so we don't have to look at this terribly long."

Considering the lack of factual support in the record to determine how long the photos were displayed, that trial's transcripts show that the State's counsel was not wanting to look at the photos "terribly long," and the multiple reasons the photos were relevant to the State's case, we find no support for Cherry's claim. Accordingly, we hold that the district court did not abuse its discretion.

*Limited Questioning of "Beth"*

At trial, Cherry presented testimony of "Beth," who testified that she had been in the area on the day of the shooting. Beth testified that she knew another person in the area who generally matched the same description witnesses gave of the shooter. Cherry's counsel asked if she had an opinion on "who might have committed the crime, who might have been the gunman in this crime" and she replied "yes." Counsel then asked Beth

14

about a video she'd previously seen on Bob's phone of two men driving around in a car screaming loudly. She stated that, at the time, she didn't know who the men were, but by the time of trial, she could identify the men.

Cherry's counsel then asked her to state who was in the video and the State objected on hearsay grounds. The State explained that it had not seen the video, the video wasn't in evidence, and the defense didn't have the video. The court sustained the objection, but it gave Cherry the opportunity to lay a foundation for Beth's testimony to be admitted. Instead of describing how the video might be relevant, Cherry's attorney immediately responded "I think she is done. We didn't plan to go any deeper with it." After the court questioned Cherry's counsel on how the State could cross-examine a witness about a video it did not see or have, Cherry's counsel responded "[w]e can walk away from the video." Beth was then questioned about the other man she believed matched the description of the shooter where she explained that other man had been to her friend's house to sell marijuana some time after Bob's shooting.

Cherry now argues that the district court's decision to prohibit further questions about the video violated his right to present a full and complete defense.

Appellate courts review de novo a claim that a district court's ruling has interfered with a defendant's right to present a defense. *State v. Waldschmidt*, 318 Kan. 633, 657, 546 P.3d 716 (2024); *State v. Maestas*, 298 Kan. 765, 780, 316 P.3d 724 (2014). But the fundamental right to a fair trial is "subject to statutory rules and caselaw interpreting the rules of evidence and procedure." 298 Kan. at 781 (citing *State v. Wells*, 289 Kan. 1219, 1235, 221 P.3d 561 [2009]). One such rule is that of preservation.

The State argues that Cherry has failed to make a sufficient proffer to preserve the issue for appellate review. We agree. K.S.A. 60-405 states that:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

This means that the "party being limited by the exclusion of evidence has the responsibility of proffering sufficient evidence to the trial court in order to preserve the issue on appeal." *Hudgins*, 301 Kan. at 651.

"The proponent of excluded evidence has the duty of making known the 'substance' of the expected evidence in a proffer. A formal offer of proof in question and answer form is not required if an adequate record is made in a manner that discloses the evidence sought to be introduced. Failure to make a proffer of excluded evidence precludes appellate review because there is no basis to consider whether the trial court abused its discretion. [Citations omitted.]" *State v. Evans*, 275 Kan. 95, 99-100, 62 P.3d 220 (2003).

For approximately three pages, the court asked Cherry's counsel for foundation for the video. Cherry's counsel, on two separate occasions, instead abandoned that line of questioning. Cherry argues in his brief that Beth would have testified that Cherry was not the shooter and the video would have pointed to evidence that someone else was the shooter. However, the record contains no information regarding who was in the video, what the video contained, *or how the video relates to who shot Bob*. Cherry's counsel was given ample opportunity to proffer why Beth's testimony regarding the video would be relevant, but he elected to not "go any deeper with it." Counsel did not make an adequate proffer regarding Beth's testimony about the video to preserve the issue for appellate review.

16

*Jury Trial Waiver*

At trial, the district court accepted and admitted a stipulation from Cherry regarding a prior felony conviction without securing a waiver of Cherry's jury trial rights. This stipulation was used to support necessary elements of Cherry's criminal possession of a firearm charge. The stipulation was discussed and accepted at the pretrial conference. During that conference, the district court specifically questioned whether "you guys all talked about exhibits and *worked on any stipulations* so the trial will move smoothly." (Emphasis added.) To which the State responded "[Cherry's counsel] and I have visited about that . . . and the parties both ways are stipulating." The defense opted to use the stipulation "to the felony portion of it so that the State doesn't have to prove and identify to the jury what the felony is." The stipulation was signed by Cherry, Cherry's counsel, and both attorneys for the State. At trial, it was admitted and read to the jury.

When a defendant stipulates to an element of a crime, "the defendant has effectively given up" his or her federal constitutional right to a jury trial on that element. *State v. Johnson*, 310 Kan. 909, 918-19, 453 P.3d 281 (2019); see *Apprendi v. New Jersey*, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (holding that the Fifth and Sixth Amendments to the United States Constitution "entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt'"). The State concedes that the district court's failure to secure a jury trial waiver from Cherry was error.

A district court's failure to secure a jury-trial waiver before accepting a defendant's stipulation is constitutional error. See *State v. Guebara*, 318 Kan. 458, 460, 544 P.3d 794 (2024); *State v. Bentley*, 317 Kan. 222, Syl. ¶ 2, 526 P.3d 1060 (2023). As a result, this court reviews such jury trial violations for constitutional harmless error. 317 Kan. 222, Syl. ¶ 2. The party benefitting from a constitutional error must show beyond a reasonable

doubt that the error did not affect the trial's outcome; in this context, that means the State must show that there was no "reasonable possibility the failure to inform" Cherry "of his right to jury trial led to his decision to enter the stipulation." 317 Kan. at 234.

The State argues that any error was constitutionally harmless, because Cherry received a bargained-for benefit from the stipulation. The State is correct. See *Guebara*, 318 Kan. at 471-72 (error harmless because defendant's offer to stipulate and State being prepared to present evidence); *Bentley*, 317 Kan. at 235-36 (error harmless because testimony supported a finding that defendant would have elected to stipulate if he had been informed of his jury trial right because it was the defense's "'strategy to keep from the jury specifically what [defendant] had been convicted of in the past'").

Cherry argues that his case differs from *Bentley* and *Guebara* because the record is "bare" with regard to discussions between Cherry and his counsel. While Cherry is correct there was no direct exchange between his counsel and the judge about the stipulation, the district court specifically asked whether the parties had worked together on the stipulation. We hold the record is sufficient to find the error harmless beyond a reasonable doubt.

*Cumulative Error*

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Zongker*, 319 Kan. 411, 433, 555 P.3d 698 (2024). In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated

are constitutional in nature, the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *Alfaro-Valleda*, 314 Kan. at 551-52.

We have identified four errors, comprised of three prosecutorial errors and the district court's failure to obtain a jury trial waiver before accepting Cherry's stipulation to a prior felony conviction. We already concluded that individually, these errors were harmless. We now find that even considering these errors together, the cumulative effect did not affect the outcome of the trial. The prosecutorial errors were minor in light of the context of the trial, Cherry received a benefit from his stipulation, and the State presented strong evidence of Cherry's identity. Cumulative error did not deprive Cherry of a fair trial.

*Speedy Trial*

Lastly, Cherry argues that the delays in bringing him to trial caused by COVID-19 violated his constitutional speedy trial rights under the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution's Bill of Rights. While Cherry initially identifies a delay of nearly four years between his arrest and the start of his trial, Cherry concedes in his brief that the defense caused much of the delays. Specifically, Cherry conceded that he caused the delays from February 21, 2019, until the pre-pandemic proposed trial date of June 15, 2020, and also between April 13, 2021, until the ultimate trial beginning on February 13, 2023.

This leaves only a disputed period from June 15, 2020, until April 13, 2021—9 months and 23 days. Both parties agree that this nearly 10-month delay was caused primarily by COVID-19. In determining whether Cherry's speedy trial rights were violated, Cherry argues that pandemic related delays should be weighed against the State. The framework for considering speedy trial challenges is well settled.

"The Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights both provide a right to speedy trial. *State v. Otero*, 210 Kan. 530, 531, 502 P.2d 763 (1972). 'It is . . . impossible to determine with precision when the right [to a speedy trial] has been denied.' *Barker v. Wingo*, 407 U.S. 514, 521, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Instead, we have followed *Barker* in adopting a four-factor balancing test:  (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of the speedy trial right; and (4) prejudice to the defendant. *State v. Ford*, 316 Kan. 558, 561, 519 P.3d 456 (2022); *State v. Hayden*, 281 Kan. 112, 127, 130 P.3d 24 (2006) (observing this court adopted the *Barker* factors in *Otero*). 'Because the test requires a balancing, none of these factors is a necessary or sufficient condition for finding a violation. Instead, we consider them together along with any other relevant circumstances.' *State v. Owens*, 310 Kan. 865, 869, 451 P.3d 467 (2019)." *State v. Smith*, 320 Kan. 62, 70, 563 P.3d 697 (2025).

When considering the length of the delay, the first *Barker* factor involves two separate inquiries. *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). First, the court must decide whether the relevant interval "has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." 505 U.S. at 651-52. If so, the court must consider the remaining *Barker* factors. *State v. Owens*, 310 Kan. 865, 872-73, 451 P.3d 467 (2019). Second, once this analysis is triggered, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett,* 505 U.S. at 652.

Time elapsed, on its own, is not the only relevant yardstick for measuring presumptive prejudice. *Owens*, 310 Kan. at 872 ("But we have rejected the 'inflexible' approach of determining presumptive prejudice based on predesignated permissible lengths of time."). Indeed, "whether the length of delay is presumptively prejudicial depends on the peculiar circumstances of each case, and the mere passage of time is not

20

determinative." *State v. Weaver*, 276 Kan. 504, Syl. ¶ 3, 78 P.3d 397 (2003). Under *Barker*, the analysis "is necessarily dependent upon the peculiar circumstances of the case" and, for example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker v. Wingo*, 407 U.S. 514, 530-31, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

In Cherry's case, the overall delay was just shy of four years. The State concedes that this delay is presumptively prejudicial, even for a murder trial. We have previously assumed without deciding that such lengthy delays are presumptively prejudicial. *State v. Barrett*, 309 Kan. 1029, 1045, 442 P.3d 492 (2019) (assuming without deciding that four-year delay and prejudice factors weighed in defendant's favor); *In re Habeas Corpus by Snyder*, 308 Kan. 615, 619, 422 P.3d 1152 (2018) (a nearly five-year delay was assumed to be presumptively prejudicial). Because the COVID-19 pandemic involved such unique circumstances, we assume without deciding that the delay Cherry experienced was presumptively prejudicial. Therefore, we consider the remaining *Barker* factors.

The second factor—the reason for delay—is the "flag all litigants seek to capture." *United States v. Loud Hawk*, 474 U.S. 302, 315, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986). To analyze this factor, "different weights should be assigned to different reasons" for any delays in bringing a case to trial. *Barker*, 407 U.S. at 531. Courts must determine who was responsible for the delay and then assign each delay a particular weight. Regarding government delays:

> "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." 407 U.S. at 531.

Generally, delays caused by the defendant will be considered valid, though they may weigh against the defendant. *In re Care & Treatment of Ellison*, 305 Kan. 519, 535-36, 385 P.3d 15 (2016); see also *Vermont v. Brillon*, 556 U.S. 81, 90, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009) (observing "delay caused by the defense weighs against the defendant").

As previously noted, Cherry has conceded that he caused all the delays except for those between June 15, 2020, and April 13, 2021. We therefore weigh the delays caused by Cherry against the defense. The only remaining time period for us to evaluate is between June 15, 2020, and April 13, 2021.

At the time that COVID-19 delays went into effect, Cherry had a pretrial motion to suppress pending. Before the pandemic, a hearing on that motion was scheduled for April 2020. Due to pandemic closures, however, it was initially rescheduled for July 2020. But Cherry insisted that the hearing on this motion be in-person. Noting that courts had not begun to schedule in-person hearings yet, the district court scheduled a status hearing for September 8, 2020. The motion hearing was continued for 30 days at the September status hearing because in-person hearings had not yet resumed. That trend continued over the next several months. On March 31, 2021, Cherry filed a motion to change judges. Consequently, the previously scheduled status hearing in April 2021 for Cherry's suppression motion did not occur, and instead, that time was used as a hearing on his motion to change judges. During these extensions, the district court informed Cherry that COVID-19 policies had stayed the speedy trial clock.

That distills our ultimate question to be whether a district court's delays in hearing a defendant's pretrial motion are attributable to the State when the defense insisted on in-person hearings at a time when courts had suspended in-person hearings due to COVID-19.

Whether COVID-19 delays are attributable to the State is a question which has not been directly addressed in Kansas. However, in *Smith*, the court suggested those delays would not be weighed against the defendant. 320 Kan. at 70-72. However, that speedy trial analysis focused on the first *Barker* factor, presumptive prejudice, and, finding no prejudice, did not discuss the second *Barker* factor.

> "Ultimately, we conclude that the delay here was not presumptively prejudicial. Instead, the delay was reasonable when viewing both the State's new evidence and Smith's need to rebut that new evidence in light of the purely circumstantial case for Smith's guilt—particularly viewed within the overall state of the world during and after the COVID-19 pandemic, which necessarily slowed all testing down." 320 Kan. at 72.

In *Smith* we took a neutral approach to considering COVID-19 related delays in evaluating presumptive prejudice. We extend that approach to consider COVID-19 delays a neutral factor under the second *Barker* factor. And we are not alone in doing so. See *State v. Contreras-Avila*, No. 125,485, 2024 WL 4002824, at *8 (Kan. App. 2024) (unpublished opinion) ("This 170-day period cannot weigh against the State, because it arose purely from state and local governments' response to the COVID-19 pandemic, which was completely outside the State's control."); see also *United States v. Keith*, 61 F.4th 839, 853 (10th Cir. 2023) ("We choose to treat COVID-19 as a truly neutral justification—not favoring either side. The extenuating circumstances brought about by the pandemic prevented the government from trying Keith in a speedy fashion."); *State v. Paige*, 977 N.W.2d 829, 840 (Minn. 2022) ("In contrast, the statewide orders issued in response to the COVID-19 global pandemic reflected a policy decision prompted by an *external* public health crisis. Because the statewide orders were prompted by an external factor, we conclude that the trial delays caused by the orders do not weigh against the State [in a constitutional speedy trial claim].").

Cherry invites us to find that Kansas should follow the approach of other jurisdictions which have held that COVID-19 delays were attributable to the State. We are unconvinced and decline his invitation. Because Cherry does not suggest any other reason that the nearly 10-month delay should be attributable to the State and because Cherry concedes the rest of the delays were attributable to the defense, the second *Barker* factor weighs in favor of the State.

However, we must still consider the two remaining *Barker* factors—Cherry's assertion of the right and any prejudice he suffered. In *Barker*, the Court explained "[t]he defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." 407 U.S. at 531-32. Failing "to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532. In *State v. Rivera*, we observed that when the defendant first asserts the right is material:  the later the motion, the less heavily the assertion is weighed in the defendant's favor. 277 Kan. 109, 118, 83 P.3d 169 (2004).

Here, while Cherry did file a motion asserting his speedy trial rights on July 17, 2022, it was nearly three-and-a-half-years after he was arrested. The district court held a hearing on this assertion and considered many factors in denying Cherry's motion. In making this determination, the district court specifically noted that at multiple points during his incarceration, Cherry voluntarily waived his speedy trial rights. The district court found that, outside of COVID-19 delays, the defendant had been provided with a speedy trial. Because Cherry waited a substantial period of time to assert the right, this factor weighs neutrally.

The last *Barker* factor we consider is prejudice. "In analyzing the prejudice factor, *Barker* identified three interests the speedy trial right was designed to protect:  (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the

accused; and (3) to limit possible impairment of the defense." *Owens*, 310 Kan. at 880. The final factor is "the most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

Cherry argues that he experienced prejudice because he has been in jail during this time, and his bond was set at $1,000,000. He argues that this caused considerable anxiety and was oppressive. He does not assert that this period of incarceration impaired his defense. However, as noted, a majority of the delays were caused by Cherry, who even went as far as refusing to leave his cell to attend virtual court. Upon our review of the record, we do not find evidence that Cherry experienced prejudice due to these delays.

Considering the *Barker* factors in their totality, we find no violation of Cherry's speedy trial rights.

Affirmed.

WILSON, J., not participating.